**J.W. "Jack" BREBAUGH, Appellant (Plaintiff),**

v.

**Kerry HALES; William Beisner; James Freeman; and Dravo Coal Company, a Delaware corporation, Appellees (Defendants).**

No. 89–67.

Supreme Court of Wyoming.

March 15, 1990.

---

**1130**

J. Douglas McCalla of Spence, Moriarity & Schuster, Jackson and Kennard F. Nelson of Kirkwood, Copenhaver & Nelson, Laramie, for appellant.

Patrick Dixon of Murane & Bostwick, Casper and John A. MacPherson of Johnson, MacPherson & Noecker, Rawlins, for appellees.

Stanley K. Hathaway of Hathaway, Speight & Kunz, Pamela L. Jacklin and Tracy Pool Reeve of Stoel, Rives, Boley, Jones & Grey, Portland, Or., for amicus curiae, Bridger Coal Co.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

J.W. "Jack" Brebaugh (Brebaugh) received injuries on January 6, 1986, while working on a "splicing" procedure on a conveyor belt in an underground coal mine near Hanna, Wyoming. He was employed by Carbon County Coal Company (CCCC), a Colorado general partnership formed by partners Dravo Coal Company (Dravo), a Delaware corporation, and Rocky Mountain Energy Company (RMEC), a Utah corporation.

Although Brebaugh received an award under the provisions of the Wyoming Worker's Compensation Act through CCCC's account as a contributing employer, he filed a tort action against Dravo and four supervisory co-employees, seeking to recover money damages for his personal injuries. He appeals from the district court's order dismissing Dravo under W.R.

C.P. 12(b)(6), and from that court's order granting summary judgment for three of his co-employees.[1]

We affirm.

The parties agree that the issues are as Brebaugh has stated them:[2]

I.  Did the district court err in granting summary judgment to the co-employee defendants when there existed a genuine issue of material fact concerning culpable negligence?

II.  Did the district court err in failing to allow plaintiff to conduct proper voir dire relative to worker's compensation benefits?

III.  Is a corporation-partner who takes on independent duties under a separate management contract with the partnership to be considered an "employer contributing as required by law" under the Wyoming Constitution and statutes so as to acquire immunity under the Worker's Compensation Act from suit by an employee of the partnership?

## FACTS

In CCCC's mining operation a main conveyor belt carried the mined coal from underground uphill to the surface. The main conveyor belt consisted of three sections designated as U-1, U-2, and U-3. The U-2 belt, on which Brebaugh was working when injured, was fifty-four inches wide and about 2,000 feet long, weighing at least ten pounds or more per foot. Resembling in general appearance an elongated rubber band, the belt rested on a conveyor frame suspended from the ceiling of the mine shaft. The bottom portion of the belt loop was about six to seven feet above the sloping ground. The belt was a series of sections fastened together by mechanical fasteners. The mechanical fastener was held together by a pin inserted through the fastener.

1.  Brebaugh does not appeal the district court's order granting summary judgment for co-employee Paul Kehrer.

2.  In an amicus brief, Bridger Coal Company addressed this issue: Are all members of a partnership or joint venture, as well as the partnership or joint venture itself, the employer of all employees working in pursuit of the partnership's or joint venture's business for purposes of the Wyoming Worker's Compensation Act?

On occasion CCCC eliminated a mechanical fastener. To do this, CCCC "spliced" the affected belt section. The objective in the "splicing" procedure was to separate the belt at the designated belt section, cut out the mechanical fastener, add more belt if necessary, overlap the loose ends of the belt, and melt together those loose ends by means of a heating device; this last step is called "vulcanizing." CCCC had available for use a manual, *Royalon Vulcanized Splicing Manual,* which contained instructions to keep clamps on the belt at all times while making a splice and to keep tension on all of the belt, except for that part of the belt being spliced. With this general orientation in mind, we turn our attention to the facts and circumstances leading up to and surrounding the accident in question.

The accident happened January 6, 1986, several hours into the "graveyard" shift, 12 midnight to 8:00 a.m., the shift Brebaugh worked. At the start of that shift, appellee Hales, CCCC's general foreman in charge of the work, assigned appellee Beisner, a section foreman, to work on splicing the U–2 belt at a location previously identified by Paul Kehrer, the foreman on the previous shift. Since Beisner had little or no experience with this procedure, Hales considered his assignment as a training exercise. Hales assigned Brebaugh, Hassel, Cook, and Schriner as crew members under Beisner. Hales chose these crew members based on their prior experience in the mine and with conveyor belts. Although Brebaugh had no prior experience splicing U-belts, he had prior experience splicing smaller section belts. Although modest about his experience, Brebaugh testified that as a production belt man of five years' experience he was probably the best trained person at CCCC with respect to operation, repairs, and maintenance of section belts. Hassel had vulcanized U-belts about ten times and had both classroom instruction and on-the-job training on the procedure. Cook had received on-the-job training on vulcanizing or splicing U-belts at CCCC and had performed the procedure about three times. Schriner had also received classroom instruction and on-the-job

training on the vulcanizing and splicing procedure; he had performed the procedure on U-belts three or four times.

Hales asked appellee Freeman, a shift foreman, who had regularly assigned duties in another section of the mine, to take Brebaugh's crew to the designated work area, determine whether enough slack in the belt existed to permit a splice, and report his finding to Hales. Freeman took the crew to the area where the vulcanizing station was set up. They found that the U–2 belt was not centered properly. They worked for several hours trying to pull down slack in the belt using three-ton chain come-alongs. They were not able to pull down any slack. Freeman called Hales and told him they did not have enough slack to make the splice.

Hales told Freeman to go uphill to a fifty-foot section of belt located above the belt drive mechanism and add that section to the belt. Freeman passed that information on to Beisner. According to Hales, that fifty-foot section had been placed there some time previously in expectation of having to add it into the belt at a later date. Hales believed that in late 1984 sections of belt had been added to the U–2 belt at that same location. He believed that three supervisors had been in that area during that operation. The crew then moved their equipment, including come-alongs and clamps, uphill to the location designated by Hales. Freeman told them they were to put the clamps on the belt, pull the pin, and insert the fifty-foot section of belt. Freeman then left to perform his regularly assigned duties in another section of the mine.

At the designated location the crew put clamps on each side of the belt. Hassel and Brebaugh worked on one side of the belt; Cook and Schriner worked on the other. Working on the bottom loop portion of the belt, the crew put clamps both downhill and uphill from the spot on the belt section where the splice was to be made. Attaching the come-alongs to the clamps, they took up the slack until the belt dropped a little where they could remove the pins. After they removed the pins,

they loosened the come-alongs on the downhill side of the splice. They removed the downhill side come-alongs and clamp, allowing the downhill section of the belt to drop to the ground.

At this point in the operation, Hassel and Brebaugh discussed the substantial tension remaining on the uphill section of belt. According to Brebaugh, Hassel was in charge. As they were discussing what to do, Hales arrived at their work area. He asked them if they needed belt pins, and Brebaugh answered they needed two. Then Brebaugh asked Hales, "What are we going to do about that upper belt?" Hales replied, "Well, you can take the clamp off and it'll drop to the ground." That was the substance of their conversation. Hales was there only a minute or so and he left. Hales testified that he left to attend to another work matter but intended to return to the splicing operation. He thought Brebaugh's crew would take a break and he would be back to their area before they were further along in their work. According to Hales, before he visited the work site he had considered that it was possible the uphill belt end could run because it was taut. After visiting the site and seeing the belt, he concluded there was enough slack in the belt so that the belt would not run when the clamps were released.

After Hales left, Hassel and Brebaugh again discussed the tension on the belt. Brebaugh was concerned about the tension because they were above the belt drive mechanism. He had concern for the equipment, but it never entered his mind that if the belt started running there was danger to human safety. He testified, "I did not foresee an unsafe condition there. * * * If I would have foreseen a possibility, I wouldn't have been there."

About five or ten minutes later, Beisner came to their location. According to Brebaugh, Beisner stayed a "very, very small period of time." While there, Beisner was asked by Brebaugh what they should do about the clamp on the belt. According to Brebaugh, Beisner echoed Hales' earlier remark, namely, remove the clamp and the belt would drop to the ground. Beisner was unaware of the possibility of the belt coming free and running loose. Beisner left to get some belt pins. He thought he would return before the crew's work went much further.

After Beisner left, Hassel and Brebaugh again discussed removing the clamp. According to Brebaugh, Hassel asked him, "What do you think we should do?" Brebaugh answered, "Hell, I don't know." Hassel then said, "Well, they told me to take the clamp off." Brebaugh then said, "Well, I'm not going to take it off." Brebaugh testified he was not going to remove the clamp because he "was afraid the belt was going to get loose and run." He did not see any personal danger, only danger of damaging the equipment. According to Brebaugh, Hassel repeated, "Well, they told me to take it off." Brebaugh replied, "Here's my wrench, help yourself." Brebaugh also said, "You do what you want to do. * * * You're in charge, I can't make a decision for you."

Brebaugh testified that Hassel made the decision to loosen the clamp. According to Brebaugh, Cook and Schriner on the other side of the belt also started loosening the clamp on their side. As Hassel loosened the nut on the clamp, the belt started slipping. Brebaugh said, "Jim, the belt's slipping." Hassel said, "Yes, I know it." Hassel stood back and Brebaugh gave him a 12 spud wrench. Hassel very gingerly loosened the nut and the belt started slipping again; then, it suddenly came loose and ran uphill. Hassel, Cook and Schriner ran after the belt, trying to catch it. Brebaugh called to them, "What are you going to do when you catch it?" Brebaugh told them to come on back.

At that point, Brebaugh thought the run-a-way belt would reach the top of the conveyor, come around the top, come down the conveyor past them, and pile up down at the belt drive. According to Brebaugh it took about two minutes or less for the run-away belt to reach the top, go around the top, and come back down. During that period of time, the other crew members returned to where Brebaugh was located. During that period of time, Brebaugh did

not think there was an unsafe condition. Hassel asked Brebaugh where he thought the belt would end up. Brebaugh answered he did not know if it was going down to the drive or all the way down, and that he would go see. Cook and Schriner testified they could hear uphill the run-away belt as it was starting on its downhill course. They simply stepped back from the conveyor belt frame.

About this time Brebaugh walked toward the frame and was going to walk underneath it in order to go downhill to see where the downhill descending belt would land. As he started to pass under the belt frame, he heard a loud noise uphill. He described what happened next, "I knew something bad was happening and about that time the area filled full of dust and within a matter of a couple of seconds, I was hit. I had the belt before me and I crumbled to the ground."

Brebaugh testified that he does not think Freeman or any of the others did anything intentionally to hurt him. He does not think they knew the belt was going to run. In his words, "Everyone tried their best to keep the equipment running and keep from getting people hurt * * *."

In his complaint against Dravo and his co-employees Freeman, Beisner and Hales, Brebaugh alleged they were negligent or culpably negligent in the following ways:

> Freeman sent Brebaugh and his crew members to do an inherently dangerous job, namely, splicing the U–2 belt, for which they had no adequate training and in an area on the conveyor that he knew or should have known was unsafe for splicing. He did not provide supervision for the splicing operation, and the operation was done contrary to standard procedure.
>
> Hales and Beisner told Brebaugh and his crew members to release a clamp which was securing the belt at a time and place where they knew or should have known that such release would cause the belt to run out of control.

The defending co-employees answered the complaint, generally denying the culpable negligence allegations applicable to them.

On July 29, 1986, Dravo filed a motion to dismiss under W.R.C.P. 12(b).[3] On September 22, 1986, the trial court filed its order setting the hearing on the motion for November 3, 1986. On October 6, 1986, Dravo filed the affidavit of the clerk of the district court, to which was attached a copy of the court's file of Brebaugh's worker's compensation claim. On October 17, 1986, Dravo filed its pleading entitled, "Submission of Affidavits Pursuant to Rule 12(b)," which stated Dravo had filed the clerk's affidavit and also the affidavit of James A. Berneburg. Berneburg's affidavit informed that he was vice-president, general counsel and secretary of Dravo; that CCCC was a Colorado general partnership formed by Dravo and RMEC; and that appellees Hales, Beisner, and Freeman were CCCC employees.

On November 3, 1986, Dravo filed its legal memorandum supporting its motion in which it referenced and relied on the affidavits of the clerk of court and Berneburg. On November 14, 1986, Brebaugh filed his legal memorandum in opposition to Dravo's motion in which he acknowledged that CCCC was a partnership formed by Dravo and RMEC and requested more time in which to conduct discovery to meet Dravo's motion. On March 12, 1987, the trial court issued its decision letter in which it informed the parties it was granting Dravo's motion. The letter indicates the court gave Brebaugh from November to March to conduct discovery and that Brebaugh's counsel had told the court that they had conducted discovery but had no evidence to submit to counter the motion.

On March 30, 1987, the trial court granted Dravo's motion. In its order the court refers to Dravo's submission of affidavits. The order states that Dravo, as one of the partners forming CCCC, the partnership employing Brebaugh, is entitled to the same immunity under the Wyoming Work-

---

**3.** Dravo's W.R.C.P. 12(b) grounds included failure to state a claim upon which relief can be granted, known as W.R.C.P. 12(b)(6).

er's Compensation Act as CCCC. Although the trial court certified its order of dismissal as a final order pursuant to W.R.C.P. 54(b) and Brebaugh filed a notice of appeal, this court dismissed the appeal because the trial court had failed to articulate its reasons for its certification. *Tader v. Tader*, 737 P.2d 1065, 1066 n. 1 (Wyo.1987).

On April 13, 1987, the defending co-employees filed a motion for summary judgment. The trial court denied the motion on July 14, 1987. On October 12, 1988, a few weeks before the trial was to begin, the defending co-employees filed a motion to reconsider the court's denial of the summary judgment motion. Trial began before the trial court ruled on that motion. During voir dire Brebaugh's counsel told the prospective jurors that if a money judgment resulted from the action, Brebaugh was required by law to repay the worker's compensation two-thirds of the benefits he had received for his work-related injury. The trial court declared a mistrial.

The defending co-employees again moved for summary judgment, relying on the materials previously submitted by the parties and case law from this court decided since the court's previous denial of their earlier motion. Both parties submitted legal memoranda. After considering the materials submitted and the legal memoranda, the trial court granted the motion for summary judgment.

On January 3, 1989, Brebaugh filed a motion for reconsideration of the trial court's order dismissing Dravo. Along with the motion, Brebaugh submitted numerous documents, including Dravo and RMEC's partnership agreement and CCCC and Dravo's management contract specifically referenced in the partnership agreement. The submission of the partnership agreement and the management contract obviously came too late. Dravo opposed Brebaugh's motion. Brebaugh submitted a legal memorandum in support of his motion, contending that under Dravo's management contract Dravo assumed

duties toward CCCC's employees separate and apart from the duties that CCCC as employer assumed toward its employees. On February 21, 1989, the trial court denied Brebaugh's motion. This appeal followed.

## *ANALYSIS*

### I. Dravo's Dismissal

Considering the facts surrounding Dravo's W.R.C.P. 12(b)(6) motion to dismiss, we hold that the motion was automatically converted to one for summary judgment. *Mostert v. CBL & Associates*, 741 P.2d 1090, 1096–97 (Wyo.1987); *Torrey v. Twiford*, 713 P.2d 1160, 1164 (Wyo.1986); and *Greaser v. Williams*, 703 P.2d 327, 336 (Wyo.1985). Consequently, we review the trial court's order dismissing Dravo in light of our long-recognized and often-stated summary judgment standards. *Cyr v. Board of County Commissioners of Platte County*, 780 P.2d 986, 988 (Wyo. 1989); and *Milligan v. Big Valley Corporation*, 754 P.2d 1063, 1068 (Wyo.1988).

Because Brebaugh did not submit documents to oppose the affidavits filed by Dravo and considered by the trial court, we first consider whether any genuine issues of material fact exist on Dravo's being one of the partners forming Brebaugh's statutorily contributing employer, the partnership CCCC, and on Brebaugh's being an employee of that partnership. We find none. Next, we consider whether Dravo, as one of the partners forming the partnership employing Brebaugh, is entitled to judgment as a matter of law. More precisely, we are deciding, as a matter of first impression, whether a partner enjoys the same immunity as the partnership under Wyoming's Worker's Compensation Act.

■ The Wyoming Constitution [4] and the Wyoming Worker's Compensation Act [5] provide that a covered employee's rights to compensation from the fund are in lieu of any rights and remedies against that em-

---

**4.** Art. 10, § 4.

**5.** Chapter 12 of Title 27 (Worker's Compensation, §§ 27–12–101 to 805) was repealed in 1986 and recreated as current Chapter 14 (W.S. 27–14–101 to 804 (1977)) effective July 1, 1987. This case arose under the prior act.

ployee's contributing employer. Brebaugh acknowledges that his employer, CCCC the partnership, is immune from tort liability. He claims that Dravo, one of the two partners forming that partnership, does not enjoy that same immunity. We disagree.

Recently, in *Hays v. State, ex rel. Wyoming Workers' Compensation Division,* 768 P.2d 11 (Wyo.1989), this court aligned Wyoming with the majority of jurisdictions, holding that a partner is not eligible to receive benefits as an employee under the act. We described the legal characteristics of partners and partnerships. We said, "[a] partnership is not an entity separate from its partners. 1C A. Larson [Workmen's Compensation Law § 54.31 (1986) ]." *Hays,* 768 P.2d at 14. We quoted with approval from a 1926 decision of the New York Court of Appeals: "The copartners, of course, are the principals and employers * * *. *Lyle v. H.R. Lyle Cider & Vinegar Co.,* 243 N.Y. 257, 153 N.E. 67, 67–68, 47 A.L.R. 840 (1926)." *Hays,* 768 P.2d at 15. In *Claudio v. Lefrak,* 100 A.D.2d 837, 473 N.Y.S.2d 833, 834–35 (1984), the court held that the employee's compensation award through the employer partnership bars the maintenance of any common law action against either the partnership or its members. According to Professor Larson, "a member of a partnership, even if he is a 'working partner,' is still in law the employer of employees of the partnership and cannot be sued" as a "third person" against whom common law actions may be brought for compensable injuries. 2A A. Larson, *The Law of Workmen's Compensation* § 72.15, p. 14–89 (1989). The vast majority of jurisdictions considering this issue has held that a partner is an employer. *Swiezynski v. Civiello,* 126 N.H. 142, 489 A.2d 634, 638 (1985).[6] We align Wyoming with this majority.

We have said that an important characteristic of the employer's status is his right to control the employee's work performance. *Boehm v. Cody Country*

*Chamber of Commerce,* 748 P.2d 704, 712–13 (Wyo.1987). Under the Wyoming Worker's Compensation Act the distinguishing features of the employment relationship become the employer's rights to the employee's labor and to control the employee's performance of that labor and the employee's corresponding rights to compensation for that labor and benefits if injured in a work-related incident.

Under Wyoming law, these distinguishing features are present in the relationship between a partner and a partnership employee. Unless the partnership agreement provides otherwise, partners "have equal rights in the management and conduct of the partnership business." W.S. 17–13–401(a)(v) (June 1987 Repl.). Consequently, each partner has an equal right to control the work performance of the partnership employee. Likewise, partners are personally liable for partnership obligations. W.S. 17–13–307. Professor Larson states:

> [I]n any ordinary partnership each partner has by law an equal share in management, and is therefore in actual possession of the powers of the employer. Unless he has contracted away these powers, which he can theoretically do, he is as much the employer as anyone can be, not as a matter of conceptual reasoning but as a matter of actual functions and rights.

1C A. Larson, *The Law of Workmen's Compensation* § 54.32, at 9–259 (1986). Accordingly, we hold that a partner retaining his right of management is in an employment relationship with partnership employees and, consequently, is an employer under our worker's compensation law.

Our worker's compensation law balances the interests of the employee against those of the employer. The employee receives a right to receive compensation benefits for work-related injuries in exchange for his forfeiture of his corresponding rights of action against the employer. The employer

---

**6.** *Swiezynski* cites *Sonberg v. Bergere,* 220 Cal. App.2d 681, 683, 34 Cal.Rptr. 59, 60 (1963); *Carlson v. Carlson,* 346 N.W.2d 525, 527 (Iowa 1984); *Mazzuchelli v. Silberberg,* 29 N.J. 15, 22, 148 A.2d 8, 12 (1959); *Greenya v. Gordon,* 389 Pa. 499, 500, 133 A.2d 595, 596 (1957); *Daniels v. Roumillat,* 264 S.C. 497, 501–03, 216 S.E.2d 174, 176–77 (1975); *Candler v. Hardware Dealers Mutual Insurance Company,* 57 Wis.2d 85, 88, 203 N.W.2d 659, 661 (1973).

receives statutory immunity from employee suits in exchange for his contribution of premiums to fund the benefits program. The effect of a ruling that a contributing employer did not include individual partners would be that partners would have to endure the liability for payment of premiums without the enjoyment of the corresponding benefit of immunity from employee suits. This ruling would frustrate the policy underlying this state's worker's compensation law. Where reasonably possible, we must construe a statute to carry out its underlying policy. *Lehman v. State ex rel. Wyoming Workers' Compensation Division*, 752 P.2d 422, 425 (Wyo.1988). We find it preferable to construe "employer" to include individual partners because it gives force to a policy central to the act.

## II. Summary Judgment For Supervisory Co–Employees

### A. Standards of Review—Summary Judgments

Our standards of review of the propriety of summary judgments in co-employee culpable negligence litigation are well established.[7] Although we need not recite those standards, we shall apply them in our analysis.

### B. Culpable Negligence in Co–Employee Litigation

Co-employee culpable negligence jurisprudence is likewise well established as the above-cited cases demonstrate.[8] Those cases give us the following principles which light our way in this case. The term "culpable negligence" means "willful and serious misconduct." The term "willful" means "such as is done purposely, with knowledge—or misconduct of such a character as to evince a reckless disregard of consequences." We distinguish "willful misconduct" from "ordinary negligence" by the aggravating factor of the tort-feasor's state of mind. We require a plaintiff to prove the tort-feasor acted with a state of mind that approaches intent to do harm. Since we appreciate that a plaintiff faces a difficult task in trying to prove the tort-feasor's state of mind, we allow the plaintiff to demonstrate that a tort-feasor has intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow. *Baros v. Wells*, 780 P.2d 341, 343 (Wyo.1989) We stated in *Bryant*, 728 P.2d at 1137:

> [W]hen state of mind is at issue and especially when willfulness of an actor's conduct is questioned, courts should be reluctant to grant summary judgment because the actor's credibility is often a central issue in such cases. [Citation.] If the evidence presented, however, does not raise sufficient doubt of an [actor's] credibility, a party's desire to test his statements by a jury will not preclude summary judgment.

In further describing the tort-feasor's intent, we have also said willful misconduct takes on the "aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. * * * [I]t must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention." *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo. 1979).

We have applied these principles in a variety of cases since 1986, beginning with *Bryant*, and most recently in *Baros*. We

---

7. *See Baros v. Wells*, 780 P.2d 341, 342 (Wyo. 1989); *Stephenson v. Pacific Power & Light Company*, 779 P.2d 1169, 1171–72 (Wyo.1989); *Case v. Goss*, 776 P.2d 188, 190–91 (Wyo.1989); *Poulos v. HPC*, Inc., 765 P.2d 364, 366 (Wyo. 1988); *Johnston v. Conoco, Inc.*, 758 P.2d 566, 568 (Wyo.1988); *Stundon v. Sterling*, 736 P.2d 317, 318 (Wyo.1986); *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722, 725 (Wyo.1987); *Bryant v. Hornbuckle*, 728 P.2d 1132, 1135 (Wyo. 1986).

8. *See also*, Annotation, *Willful, Wanton, or Reckless conduct of Coemployee as Ground of Liability Despite Bar of Workers' Compensation Law*, 57 A.L.R.4th 888 (1987); Annotation, *Right to Maintain Direct Action Against Fellow Employee for Injury or Death Covered by Workmen's Compensation*, 21 A.L.R.3d 845 (1968).

briefly·review the facts of consequence relating to the tort-feasor's conduct in several of these cases to assist us in obtaining the appropriate perspective in our review of Brebaugh's appeal. In *Baros* we affirmed summary judgment for the supervising co-employee who knowingly operated a malfunctioning backhoe near the plaintiff whom he had ordered to work in an excavation area in violation of the supervisor's own recognized safety standard. We said that neither the supervisor's placing his fellow employee in the excavation contrary to safety policy nor the supervisor's operating a backhoe in need of maintenance for a known malfunction demonstrated the supervisor's intentional commission of an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow. *Baros*, 780 P.2d at 346. We concluded that the evidence failed to show that the supervisor was aware of the degree of danger presented by the defective backhoe under the circumstances, i.e., that there was a high probability of harm. *Id.* at 346.

In *Stephenson v. Pacific Power & Light Company*, 779 P.2d 1169 (Wyo.1989), the injured employee fell from a scaffolding on which he was working to install a new overhead door. Before his fall, he had complained to four supervisory co-employees about their need to barricade the scaffolding area or to provide flaggers so as to prevent vehicular traffic from coming close to the scaffolding. These co-employees failed to provide barricades or flaggers. In his complaint the injured employee claimed the four supervisory co-employees had been culpably negligent in their failure to respond to his repeated complaints and requests. In affirming summary judgment for the supervisors, this court accepted the premise that they knew of the hazardous situation. We said that a fair characterization of their conduct was that they repeatedly passed the buck to others they assumed were more responsible. Nevertheless, we held their conduct did not demonstrate a state of mind approaching intent to do harm.

In *Johnston v. Conoco, Inc.*, 758 P.2d 566 (Wyo.1988), an inexperienced rig hand alleged that his experienced supervising driller was culpably negligent when, using a three-man crew instead of the standard four-man crew in the operation of adding a new joint of drill pipe to the pipe already in the hole, the driller, suffering from a previously injured right shoulder, mistakenly put power to the make-up tongs at the wrong time, causing the tongs to slip and crush the inexperienced rig hand's left arm. In his deposition testimony the injured rig hand stated his observations of how the driller favored his injured right shoulder, but the rig hand admitted he did not know what that condition had to do with the accident. In response to the injured rig hand's use of the affidavit testimony of another driller that the rig could not be safely run with a three-man crew, this court characterized that testimony as conclusory and lacking in specific facts; such testimony was deemed insufficient to structure an issue of material fact as to culpable negligence. This court affirmed summary judgment for the supervisory driller because the evidence failed to demonstrate that he had acted with a state of mind approaching intent to harm.

In *Stundon v. Sterling*, 736 P.2d 317 (Wyo.1986), this court affirmed a summary judgment for school bus mechanics who, contrary to the injured school bus driver's allegations, stated in their affidavits that they did not know the bus's parking brake was not working when the bus driver took the bus. The court considered the bus driver's opposing affidavits, which relied on violations of statutory duties and school district regulations, as conclusory and lacking in specific facts.

In *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722 (Wyo.1987), this court affirmed a summary judgment for the supervisor of the injured worker. The supervisor requested the worker to report for work without proper work clothing on a cold and windy night; he knew the worker had been celebrating his birthday by drinking intoxicating beverages and knew the worker had to ascend and descend a large 400–barrel oil storage tank using a ladder

welded to the side of the tank with no safety cage, safety belt or any other means to prevent a fall in the event of a slip. Recognizing that the supervisor owed his fellow employee a duty to refrain from culpable negligence, this court said the evidence fell short of demonstrating the supervisor's intent to harm the worker or that the supervisor's actions had a high probability of causing harm to him.

In *Bryant v. Hornbuckle*, 728 P.2d 1132 (Wyo.1986), the driver of a truck hauling waste production water containing some petroleum residues was injured in an explosion caused when he used a butane torch to thaw a valve on the truck's holding tank. His supervising foreman had instructed him to use the butane torch procedure. The injured driver sued the foreman, alleging he was culpably negligent in failing adequately to train and supervise him and in failing to warn him of the dangers involved in the valve-thawing procedure. In support of the foreman's motion for summary judgment, he filed his affidavit in which he stated the butane torch method was standard in the industry, he was unaware of any similar accident, and he had neither expected nor anticipated such an accident. The injured driver filed an affidavit from a safety director of another trucking company in which he stated the butane torch method was dangerous and hazardous; it was widely known in the industry as being dangerous, and thawing methods other than the dangerous butane torch method were available. In the injured driver's deposition testimony, he said that after the accident the foreman told him, "Gosh, we always wondered if something like that could happen. We didn't know." In affirming summary judgment for the foreman, this court found that the foreman did not act with a "culpable" or "willful" state of mind. The harmful consequences were unknown to him; the risk was not obvious; it was not highly proba-

ble that harm would follow. *Bryant*, 728 P.2d at 1136. This court found that the safety director's affidavit did not contain sufficient facts to establish a genuine issue of material fact and did not establish, directly or circumstantially, that the foreman had acted with the "quasi-intent" that is an essential element of culpably negligent conduct. *Id.* at 1137.

In sharp contrast to these several cases in which the alleged tort-feasor's conduct did not evince a state of mind approaching an intent to harm, we see two cases that provide examples of tort-feasor conduct that at least require the evidence to be heard by a jury. In *Poulos v. HPC, Inc.*, 765 P.2d 364 (Wyo.1988), this court reversed a summary judgment for supervisor Kennison because the evidence suggested that before the fatal accident he had entered the "Frac" tanks and had become aware of the highly dangerous and harmful nature of the fumes contained in the tanks and that because of his physical reaction to the fumes he had been told by the tank lessee's representative to have only one worker at a time in the tanks for only a brief period of time. Despite his awareness of the danger and the instruction to him, Kennison again entered the tank where the fumes were stronger than before and allowed co-employee Poulos to join him. Both men lost consciousness and had to be lifted out of the tank. Poulos died. This court said that from this evidence, "The trier of fact could reasonably find a known or obvious risk presenting a high probability of harm." *Id.*, at 367.[9]

In *Case v. Goss*, 776 P.2d 188 (Wyo.1989), we reversed a summary judgment for a co-employee safety director as he was uniquely aware of the dangerous oily and greasy condition of the boom on which the injured worker worked because of his personal knowledge and the worker's specific complaints to him about it. The injured worker claimed that the safety coordinator

---

**9.** We affirmed summary judgment for two other Poulos co-employees because their asserted violations of OSHA regulations concerning safety training and equipment did not demonstrate the requisite state of mind. There was no showing that these co-employees were aware of a high

probability of harm. Instead, they had knowledge of only possible harm and did not know the degree of danger presented by the tank in which Poulos died. *Poulos v. HPC, Inc.*, 765 P.2d 364, 366 (Wyo.1988).

had torn up the worker's maintenance request concerning the boom's condition, telling him it was not his place to be writing such requests although company policy promoted such requests from its employees. Similarly, we reversed summary judgments for several other co-employees to whom Case had repeatedly complained about the dangerous boom condition where the evidence suggested they ordered him to climb the boom despite its dangerous condition or be fired. That evidence presented genuine issues of material fact concerning the alleged tort-feasor's state of mind approaching an intent to cause harm.

Having in mind these principles of co-employee culpable negligence and our application of them in cases from 1986 forward, we apply them to the undisputed facts of consequence surrounding Brebaugh's injury.

■ We are unable to agree with Brebaugh's contention that the conduct of Freeman, Beisner, and Hales surmounted simple negligence and reached the level of culpable negligence. Brebaugh claims that these supervisory co-employees sent Brebaugh's crew, consisting of employees untrained in the dangerous splicing operation, to perform that operation without supervision. The undisputed evidence is that Hales was the supervisor in charge of the work on that shift. Hales directed Freeman to accompany the crew in order to look at the belt in question and report to him whether enough slack existed to make a splice. Beisner, having never been involved in the operation before, was assigned by Hales to accompany the crew as a training exercise for him. Thus, Freeman and Beisner had no duties with respect to the incident giving rise to Brebaugh's injury. In this instance, our focus is on Hales. The record clearly shows that Hales selected Hassel, Cook and Schriner to make the splice because of their prior splicing training and experience. It is also clear that, although Brebaugh had no U-belt splicing experience, he had extensive experience with section belts. Hales assigned Brebaugh to this crew as a training exercise on the U-belt splicing operation.

Giving the evidence in support of Brebaugh's contention every favorable inference, we find that evidence fails to show that any of the supervisory co-employees acted or failed to act with a state of mind consistent with culpable negligence, which requires known or obvious risk of a high probability of harm.

■ Next, Brebaugh claims that the location where his crew was making the splice was dangerous; the location should have been below the drive mechanism to allow that mechanism to aid in holding the uphill portion of the belt in a stationary position. The undisputed evidence shows that Hales, not Freeman or Beisner, selected the location. He did so because a fifty-foot section of belt with which to make the splice was at that spot. The record clearly shows that Hales visited that location and evaluated the situation by considering the amount of tension on the belt. He had considered that the belt could possibly run when the clamp was released; when he visited the location and had a first-hand look he made his judgment call that enough slack on the belt existed that the belt would not run when the clamp was released. While in hindsight his judgment may be criticized, the record contains no evidence to suggest that his location selection was of such a character as to evince a reckless disregard of the consequences. We find no evidence that his exercise of judgment was of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow.

Brebaugh asserts that the supervisory co-employees knew or should have known that CCCC had the vulcanized splicing manual available, containing instructions to keep clamps on the belt at all times while making a splice and to keep tension on all of the belt while making a splice, except for that part of the belt being spliced. He says that these supervisory co-employees, particularly Hales and Beisner, failed to inform the crew of those instructions and failed to follow them. Instead, he says, both Hales and Beisner gave orders to the crew to release the clamps securing the

uphill portion of the belt in disregard of those instructions. The undisputed evidence for purposes of our review shows that both Hales and Beisner told Brebaugh that, in their opinion, the belt would drop to the ground if the crew members released the clamps.

After Hales and Beisner left the crew members, intending to return before the work progressed much further, Brebaugh and Hassel continued to discuss whether they should release the clamps. Brebaugh stated that his concern was not personal safety, but rather equipment safety. The risk of harm to the crew members in the event of a run-a-way belt was not obvious to him. The evidence likewise shows that risk was not obvious to Hales, Beisner or Freeman.

According to Brebaugh, CCCC and these supervisory personnel were always concerned for the safety of the employees, as well as for the protection of equipment. Brebaugh did not think that these supervisory employees knew the belt would run; he did not think they would act or fail to act in reckless disregard for the safety of co-employees. Although there was a failure to follow the manual's instructions, under all the circumstances shown by the facts we do not find that failure to show a state of mind on behalf of any supervisory co-employee revealing a known or obvious risk of a high probability of harm in the face of that failure. We reach the same conclusion with respect to Hale's and Beisner's "orders" to release the clamps.

Brebaugh relies on the affidavit of his expert witness, Youngdahl, who opines that the acts or omissions of the supervisory personnel constituted unreasonable conduct in disregard of a known risk that made it highly probable that harm might follow. An affidavit that states a conclusion or categorical assertion of an ultimate fact cannot be used to defeat summary judgment. *Greenwood v. Wierdsma*, 741 P.2d 1079, 1087 (Wyo.1987). In this regard, we find Youngdahl's affidavit to be conclusory and insufficient to meet the burden of creating a genuine issue of material fact. We reached the same conclusion as

to similar affidavits in *Baros*, 780 P.2d at 345; *Johnston*, 758 P.2d at 569; and *Stundon*, 736 P.2d at 318. Brebaugh has presented no evidence showing these supervisory co-employees actually knew that a run-away belt and resulting personal injury were highly probable. No one recited any similar instances of run-away belts and injuries in prior belt splicing operations. As far as we can tell from the record, such an occurrence had never happened before at CCCC's mine. Brebaugh has raised no doubt concerning these supervisory co-employees' credibility. In particular, Brebaugh has not cast doubt on Beisner's and Hales' statements that they intended to return to the splicing operation before the work progressed very far and that in their judgment the belt would not run if the clamps were released.

Upon careful review of the record and consideration of the guiding principles of applicable law, we find no reason to reverse the trial judge's decision to grant summary judgment for Hales, Beisner and Freeman. Arguing in the alternative, Brebaugh urges us to hold that, although no single act or omission on the part of these supervisory co-employees constitutes culpable negligence, taken cumulatively they rise to that level of misconduct. We do not find that appropriate here and decline to so hold.

Brebaugh invites us to pass judgment on his counsel's jury voir dire on worker's compensation benefits during the aborted trial. Given our disposition of this case on the main issues presented, we need not accept that invitation.

In conclusion, we hold that Dravo, as a member of the partnership which employed the injured employee, enjoys the same immunity afforded an employer. Further, we affirm summary judgment for all appellees.

THOMAS, J., filed a specially concurring opinion.

URBIGKIT, J., filed a dissenting opinion.

MACY, J., filed an opinion concurring in part and dissenting in part.

THOMAS, Justice, concurring specially.

I have read with interest the dissenting opinion in this case, and I am puzzled by the reliance there placed on *Swiezynski v. Civiello,* 126 N.H. 142, 489 A.2d 634 (1985). The rationale for the decision in *Swiezynski* is consistent in every respect with the opinion of the court in this case. That case was remanded only for a determination, which the trial court had not made, "as to whether the partnership agreement provided that the defendants did not retain their legal rights of management." *Swiezynski,* 489 A.2d at 639.

It is clear to me that, if the management contract in our case[1] had been before it, the *Swiezynski* court would have had no difficulty in affirming the trial court. As the dissenting opinion emphasizes, by quoting from the "management contract," Carbon County Coal Company, the partnership entity composed of Dravo Coal Company and Rocky Mountain Energy Company, is designated as the "Owner" that has this relationship to the General Manager:

> "(d) *General Manager.* A General Manager, who shall have the responsibilities and authorities of the chief operating officer for Owner, shall be appointed by Owner and shall be responsible to and report to Contractor. The general supervision and management of the day-to-day operation of the Facilities shall be under the charge and control of the General Manager."

This is a specific retention by the partners of their legal rights of management.

The "management contract" further provides, in pertinent language:

> "2.02. *Scope of the Work.* * * * In performance of its Work, Contractor, through the General Manager or otherwise, will, on behalf of, and in the name of, Owner:
> "(a) hire and discharge all labor and employees, and such labor and employees

shall be and remain the separate employees of Owner, shall be carried on its payroll *and shall be subject to its full charge, supervision, and sole discretion;* * * *."* (Emphasis supplied.)

Surely, this language constitutes a retention of the right to control the employee's work. *Boehm v. Cody Country Chamber of Commerce,* 748 P.2d 704 (Wyo.1987).

It follows that not only is there an absence of any indication that in some respect the partnership agreement provided that the partners did not retain their legal rights of management, but the "management contract" specifically provided for the retention and exercise of such rights. Properly read and applied, *Swiezynski* supports the majority opinion. As for *Mickelson v. Northern Plains Natural Gas Co.,* 644 F.Supp. 630 (D.Neb.1986), the charitable approach is to distinguish the case. If it is not distinguishable, it is plainly erroneous.

URBIGKIT, Justice, dissenting.

I would reverse the district court decision to grant summary judgment for Dravo Coal Company and also for the co-employees of Brebaugh.

### Suit Against Dravo Coal Company

Dravo Coal Company and Rocky Mountain Energy Company formed a partnership which they called Carbon County Coal Company. Carbon County Coal Company, as owner, entered into a second and separate management contract with Dravo Coal Company from which Dravo Coal Company secured exclusive power and responsibility to manage the Carbon County Coal Company employees engaged in the mining operation. It is this management contract, and not the partnership agreement, that should provide the decisive information for settlement and resolution of this appeal.[1] With-

---

1. The "management contract" is found as part of the record in *Pool v. Dravo Coal Company,* 788 P.2d 1146 (Wyo.1990).

1. The *management contract,* with Dravo Coal Company designated "contractor" and Carbon County Coal Company, the partnership, designated "owner," in substantive part, provided:

in the management contract, Dravo Coal Company stood in no different stead in its relation to the operation entity—the owner—than if it had been Peter Kiewit or Morrison–Knudsen Co., or some other management, engineering or construction entity. The terms of the contract called for Dravo Coal Company to "hire and discharge all labor and employees, and such labor and employees shall be and remain the *separate employees* of Owner." (Emphasis added.) Dravo Coal Company as "contractor" was paid $500,000 a year for its management services by the business entity "owner," Carbon County Coal Company.

It is the separate entity management provision in that operational contract that also altered the typical partnership arrangement in which all partners have an equal power and responsibility for direction and control. The equal right between partners to manage employees appears central to the argument advanced by this court, but that right was removed by the operational agreement. Carbon County Coal Company and Rocky Mountain Energy Company did not participate in the management of Carbon County Coal Company employees. Dravo Coal Company, in its status as an independent entity, hired employees in the name of the business which it contractually managed, Carbon County

### ARTICLE I
### DEFINITIONS

1.01. *Definitions.* For purposes of this Agreement, certain terms and provisions used herein are defined as follows:

&ast; &ast; &ast; &ast; &ast; &ast;

(d) *General Manager.* A General Manager, who shall have the responsibilities and authorities of the chief operating officer for Owner, shall be appointed by Owner and shall be responsible to and report to Contractor. The general supervision and management of the day-to-day operation of the Facilities shall be under the charge and control of the General Manager.

### ARTICLE II
### SCOPE AND MANNER OF PERFORMANCE OF THE WORK

2.01. *Employment of Contractor.* Owner hereby appoints Contractor to perform and Contractor hereby agrees to the Work hereinafter defined.

2.02. *Scope of the Work.* The Work shall consist of supervising the construction and completion of the Mine and the development and operation of the Facilities so as to efficiently, economically and lawfully mine coal by underground methods in the volume and quality required by Owner, all in accordance with such production programs, operational programs and budgetary authorizations as may be established from time to time by Owner. In performance of its Work, Contractor, through the General Manager or otherwise, will, on behalf of, and in the name of, Owner:

(a) hire and discharge all labor and employees, and such labor and employees shall be and remain the separate employees of Owner, shall be carried on its payroll and shall be subject to its full charge, supervision, and sole discretion;

(b) at Owner's expense purchase, construct, lease or otherwise acquire all property and assets including material, supplies, equipment, water, utilities and transportation required to carry on Owner's business (such purchases and acquisitions shall be made on the best terms available taking into account all of the circumstances); obtain such customary warranties and guarantees as are available in connection with such purchases and acquisitions;

(c) pay out of Owner's funds all of Owner's direct costs and expenses. &ast; &ast; &ast;

(d) at Owner's expense procure and maintain insurance coverage pertaining to Owner's operations as may be required by applicable law, and, in addition, carry adequate Automobile Public Liability and Property Damage Insurance covering all automotive equipment which Owner may use in its operations and such other insurance, if any, as may from time to time be approved by Owner. Each policy carried hereunder shall name the Owner and the Partners as assured, as their interest may appear, and shall require the insurers to notify the Partners in writing ten days prior to any cancellation or modification thereof. Upon request, Owner will furnish each insured with a certificate issued by the insurance carrier or carriers showing the coverage in force hereunder;

&ast; &ast; &ast; &ast; &ast; &ast;

(p) provide Owner with the following administrative services:

(i) Administration, general supervision, technical and legal assistance (by Contractor's technical and legal staff or other regularly employed personnel);

&ast; &ast; &ast; &ast; &ast; &ast;

2.04. *Personnel.* Contractor shall furnish such qualified employees as may be required for the efficient performance of the Work.

As between Owner and Contractor all personnel furnished by Contractor to perform the Work shall be considered to be employees of Contractor.

Contractor shall have the right to employ consultants and to subcontract any part of the Work, subject to such limits as Owner may define.

Coal Company. I would therefore hold Dravo Coal Company was not immune as it would be in a normal partnership. If Dravo Coal Company had been wearing its "partnership" hat, I would agree Dravo Coal Company was immune from the Brebaugh suit. Dravo Coal Company, however, was performing executive services as an independent contractor when Brebaugh was injured and was not contributing to the worker's compensation fund which would be necessary for immunity. Without a consolidated designation or attributable contribution, immunity was not properly achieved when the employee managed by Dravo Coal Company, but employed by Carbon County Coal Company, was injured. *Stratman v. Admiral Beverage Corp.*, 760 P.2d 974 (Wyo.1988).[2]

While I readily agree with the majority "that a partner retaining his right of management is in an employment relationship with a partnership employee and, thus, is an employer under our worker's compensation law," I am uncertain how that holding applies to this case. Brebaugh does not question the legal effect of a partner *retaining* joint management right, but of a partner *obtaining* rights not provided by partnership law. In this case, that extraordinary contractual right is the exclusive right to manage the labor of a corporate partnership. Brebaugh asks specifically:

> Is a corporation-partner who *takes on independent duties* [as opposed to retains partnership rights] under a separate management contract with the partnership to be considered an "employer contributing as required by law" under the Wyoming Constitution and statutes so as to acquire immunity under the Worker's Compensation Act from suit by an employee of the partnership?

(Emphasis added.)

Other states considering the type of question posed by Brebaugh have answered that the partner is not immune. The Supreme Court of New Hampshire vacated a trial court decision which found individual partners immune from suit simply because the partners were part of a partnership-employer under the Workmen's Compensation laws. While that court, like the majority in this opinion, held "a partner retaining his right of management is in an employment

---

2. In obvious response to *Stratman,* the Wyoming statutes on joint entity operation were changed by Wyo.Sess.Laws ch. 226, § 1 (1989):

   27–14–102. **Definitions.**

   (a) As used in this act:

   \* \* \* \* \* \*

   (xix) "Joint employer" means any person, firm, corporation or other entity which employs joint employees, is associated by ownership, commonly managed or controlled and contributes to the worker's compensation account as required by this act;

   (xx) "Employer making contributions required by this act" means the employee's employer and any joint employer when the employer or any joint employer reports the employee's wages to the division on an account or through a consolidated worker's compensation account and contributions are made to the fund as required by this act;

   (xxi) "Joint Employee" means any person:

   (A) Who has an express or implied contract for employment with more than one (1) joint employer at the same time;

   (B) Whose work is controlled by more than one (1) joint employer; and

   (C) Who is engaged in the performance of work for more than one (1) joint employer.

   (xxii) "Consolidated Wyoming worker's compensation account" means an account maintained by the Wyoming worker's compensation division to which an employer reports the wages of its employees and joint employees for its own account and the account of its joint employers, pursuant to which contributions are made to the fund as required by this act.

   As actually suggested in *Stratman* and now detailed by the new statutory provision, the managerial answer is to designate the account within the Wyoming Worker's Compensation agency as a consolidated account under W.S. 27–14–102(a)(xxii) and include associated entities within the purview of subsection (xix). The *employer* for the consolidated account should include all entities, which by management, ownership or controlled relationships seek common worker's compensation coverage and consequently separate immunity from liability when an employee is injured.

   We are not presented in this case with a consolidated account which was permitted under prior law, *see Stratman,* 760 P.2d at 986, 987, and nothing in the record reflects why the account did not include those "consolidated" entities for which immunity is now claimed. Hopefully, corporate partnership entity businesses will recognize the exposure in non-action and the benefit in compliance with the *Stratman* worker's compensation statutory amendments of 1989.

relationship with a partnership employee and, thus, constitutes an employer under the Worker's Compensation Law," that court went on to remand "for a determination as to whether the partnership agreement provided that the defendants did not retain their legal rights of management." *Swiezynski v. Civiello,* 126 N.H. 142, 489 A.2d 634, 637, 639 (1985). The majority citation of *Swiezynski* is inapplicable for the proposition which it is stated to support.[3]

It was important to know where managerial responsibilities resided in *Swiezynski* because under New Hampshire law, the "dispositive characteristic of the employer's status is his right to control the employee's work performance." *Id.* 489 A.2d at 636 (*accord Porter v. Barton,* 98 N.H. 104, 105, 95 A.2d 118, 119 (1953)). Likewise in Wyoming. "The controlling inquiry in determining if an employment relationship exists is whether the alleged employer retained the right to control the alleged employee's work." *Boehm v. Cody Country Chamber of Commerce,* 748 P.2d 704, 712–13 (Wyo.1987). The reasoning which led the Supreme Court of New Hampshire to remand should lead this court to reverse the district court. Only Dravo Coal Company retained the right to control the employees' work.

Similar authority is found in *Mickelson v. Northern Plains Natural Gas Co.,* 644 F.Supp. 630 (D.Neb.1986), where Northern Plains was a member of Northern Border, a pipeline construction partnership. As Dravo Coal Company did with Carbon County Coal Company, Northern Border entered into a construction management contract with its partner, Northern Plains. Northern Border, the general partnership, had purchased the worker's compensation insurance policy for all the contractors on the project. Just as with Dravo Coal Company's claim of immunity as a partner to Carbon County Coal Company, Northern Plains claimed "because Northern Border paid the premium on the policy of worker's compensation insurance under which [the injured worker had] been compensated, and because Northern Plains is a general partner in Northern Border, * * * Northern Plains is immune from [the injured worker's] action for damages." *Id.* at 631.

The Nebraska court disagreed with the position taken by *Mickelson* and now Dravo Coal Company. "Northern Plains had certain duties as the construction manager of the pipeline project. Liability arising out of those duties is not extinguished through its status as a partner in Northern Border." *Id.* at 632. The aggregate theory of partnerships has its limits in providing employer's worker's compensation immunity. *Karadanis v. Sourwine,* 783 P.2d 454 (Nev.1989).

These authorities more nearly fit the present factual situation. For that reason and because I believe the holding of this court does not address the issue raised by Brebaugh and is broader than necessary to resolve this case, I dissent.

### Co–Employees' Summary Judgment

I would also reverse the summary judgment granted to the co-employees of Brebaugh because careful assessment of the record provides a conclusion that a question of material fact exists. *Baros v. Wells,* 780 P.2d 341 (Wyo.1989), Urbigkit, J., dissenting; *Poulos v. HPC, Inc.,* 765 P.2d 364 (Wyo.1988); *Wessel v. Mapco, Inc.,* 752 P.2d 1363 (Wyo.1988).

The deposition given by Hales indicates that releasing the tension from the "comea-

---

3. The issue of *Swiezynski,* 489 A.2d 634 for which the case was remanded by the appellate court to the district court following appeal for a further determination is precisely the issue presented here. That issue is the effect of an agreement of the partnership which effectively contracts away rights of equal management. That determination was controlling in *Swiezynski* and is precisely the present issue here where a "third party" management agreement is made between the partnership and one of the partners as an independent contractor. This court and particularly the special concurrence ignores the contracting away language found in the New Hampshire case which was also decisive in theory and application in *Mickelson v. Northern Plains Natural Gas Co.,* 644 F.Supp. 630 (D.Neb. 1986). *Mickelson* and *Swiezynski* are identical in applied theory in addressing results of a partner or partnership contracting away rights of management. *Swiezynski,* 489 A.2d at 637.

longs" during splicing *could* result in "imminent danger" from a runaway belt if the conveyors were on a slope. He knew Brebaugh lacked previous experience in the vulcanizing process. Brebaugh had no supervisor to watch over his first experience in this area. The point on the slope where the belt was released and its total weight of 20 tons or more almost guaranteed for anyone knowledgeable with conveyor belts that it could or would run if proper precautions had not been taken. First, proper blocking at the top and bottom pulley or belt clamps had not been provided. Secondly, the belt was "broke in" between the top and bottom so unequal weight existed, providing a gravity factor which furnished reason for the heavy conveyor "to run downhill." Third, the inexperienced employees were not warned by the supervisor of the danger that the conveyor belt could run. With all of this, the supervisor left the job site "at about dinner hour" and the unwarned employees continued into danger and tragedy. These separate acts should suffice for jury consideration of the required culpability for liability. *Case v. Goss*, 776 P.2d 188 (Wyo.1989); *Wessel*, 752 P.2d 1363.

My point of departure from the majority occurs with the evidentiary evaluation that "[t]he risk of harm to the crew members in the event of a run-a-way belt was not obvious to [Hales]." Giving every beneficial inference from the record to Brebaugh, another possible evaluation of that evidence indicates a jury *could* find a disregard of a known or obvious risk that was so great as to make it highly probable. Much would depend on which witnesses were the most credible to the finder of fact. " 'Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment.' " *Cordova v. Gosar*, 719 P.2d 625, 639 (Wyo.1986) (quoting *Fegler v. Brodie*, 574 P.2d 751, 754 (Wyo.1978)).

For these reasons, I would reverse the grant of summary judgment.

MACY, Justice, concurring in part and dissenting in part.

. I agree with the majority's decision that Dravo Coal Company is an employer which, under the facts of this case, enjoys the same immunity as is afforded to the partnership. I am concerned, however, that the majority has interpreted too broadly our decision in *Hays v. State ex rel. Wyoming Workers' Compensation Division*, 768 P.2d 11 (Wyo.1989). While general partnership law dictates that "[a] partnership is not an entity separate from its partners," *id.* at 14, a partner could agree to exist as a separate entity.

I disagree with the majority's decision to affirm the district court's grant of summary judgment on the issue of culpable negligence. The majority acknowledges that a party may establish culpable negligence by

> demonstrating that an actor has intentionally committed an act of unreasonable character in *disregard of a known or obvious risk* that is so great as to make it highly probable that harm will follow.

*Bryant v. Hornbuckle*, 728 P.2d 1132, 1136 (Wyo.1986), *quoted in Baros v. Wells*, 780 P.2d 341, 343 (Wyo.1989) (emphasis added).

In this case, Brebaugh, unlike Baros, presented sufficient evidence which demonstrated the existence of a genuine issue of material fact. The record shows that Brebaugh's supervisory co-employees failed to follow instructions in a splicing manual which directed workers to maintain clamps and tension on the belt while they completed the splicing procedure. Although the majority states that the failure to follow the directions in the manual did not show the requisite state of mind needed to establish culpable negligence, I am of the opinion that such failure and every favorable inference which may be drawn therefrom demonstrate that there is a genuine issue of material fact which should be presented to a trier of fact. *Albrecht v. Zwaanshoek Holding En Financiering, B.V.*, 762 P.2d 1174 (Wyo.1988); *Garner v. Hickman*, 709 P.2d 407 (Wyo.1985).