**Raymond BAROS, Appellant (Plaintiff),**

v.

**Eddie E. WELLS, Appellee (Defendant).**

No. 89–37.

Supreme Court of Wyoming.

Oct. 5, 1989.

Rehearing Denied Nov. 2, 1989.

Daniel G. Blythe of Borthwick, Blythe & Lewis, Cheyenne, and Richard Wolf, Cheyenne, for appellant.

Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, and Stephen H. Graham of Jones & Graham Law Office, Torrington, for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT, and MACY, JJ., and ROONEY, J. (Ret.).

MACY, Justice.

This is an appeal from a summary judgment granted in favor of appellee Eddie E. Wells on appellant Raymond Baros' co-employee culpable negligence claim. Baros was injured in the course of his employment with the Town of Torrington and received compensation for his injuries through worker's compensation. Baros initiated this action, seeking further recovery for his injuries from his supervisor/co-employee, Wells, and alleging culpable negligence under an exception to the exclusive remedy provision of the Wyoming Worker's Compensation Act as it then existed. The district court determined that there were no issues of material fact and that Wells was entitled to judgment as a matter of law.

We affirm.

Baros describes the issue simply:

Was there a genuine issue of material fact on the question of culpable negligence?

Summary judgment is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *Roybal v. Bell*, 778 P.2d 108 (Wyo.1989); *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927 (Wyo.1989). We review a summary judgment in the same light as the district court, using the same materials and following the same standards. *Roybal*, 778 P.2d 108; *Johnston v. Conoco, Inc.*, 758 P.2d 566 (Wyo.1988). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record. *Doud*, 769 P.2d 927; *Albrecht v. Zwaanshoek Holding En Financiering, B.V.*, 762 P.2d 1174 (Wyo.1988).

The materials submitted in support of and in opposition to the motion for summary judgment reveal the following facts. At the time of Baros' injury, both parties were employed by the Town of Torrington. Wells was superintendent of the Torrington water and sewer department, and Baros was a laborer/novice equipment operator. On Saturday, October 29, 1983, Wells called Baros to assist him in locating a leak in a water service line. They began work at approximately 1:00 p.m., with Wells operating a backhoe to uncover the leaking line. Baros worked in and out of the excavation, guiding Wells' placement of the backhoe bucket and shoveling dirt away from the uncovered water line. Baros usually climbed out of the excavation when Wells dug with the backhoe. Both Wells and Baros were aware that the arm and bucket of the backhoe had a tendency to drift to the left and that repairs were needed to correct this problem. Although this tendency to drift had been occurring for about six months, it had produced no harmful effect and had been easily corrected by the operator. Both men had operated the backhoe previously—Wells approximately twice a month for four years and Baros between two and four times.

The accident occurred at about 4:00 p.m., and, although it was later discovered that Baros' injuries were serious, the work continued for more than an hour after the injury. At the time of the accident, Baros

was down in the excavation at Wells' direction, standing to one side as Wells operated the backhoe. On this occasion, the backhoe arm lurched suddenly and violently to the left, striking Baros in the abdomen. A post-accident inspection and repair of the backhoe revealed a hydraulic system failure was the cause of the sudden movement of the machine.

Materials in the record additionally reveal that Wells had consumed one beer prior to going to the job site and that Baros observed two beer cans in Wells' pickup. Further, Baros claimed that he recognized the danger of being in a ditch while a backhoe is operating and that he remained in the ditch only because Wells directed him to do so.[1] Baros said he felt he would have lost his job if he had climbed out of the ditch contrary to Wells' instructions. Additional facts will be mentioned as they relate to Baros' specific contentions of culpable negligence.

Prior to its repeal in 1986, Wyo.Stat. § 27–12–103(a) (1977) provided an exception to the exclusive remedy provision of the Wyoming Worker's Compensation Act for co-employee culpable negligence.[2] Section 27–12–103(a) provided:

> The rights and remedies provided in this act [§§ 27–12–101 to –804] for an employee and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer making contributions required by this act, or his employees acting within the scope of their employment unless the employees are culpably negligent, but do not supersede any rights and remedies available to an employee and his dependents against any other person.

In *Bryant v. Hornbuckle*, 728 P.2d 1132 (Wyo.1986), we discussed this statute, stating:

> In order to recover against a coemployee under this section of the Worker's Com-

pensation Act, a plaintiff must establish more than simple negligence; the coemployee's conduct must constitute "culpable" negligence. In *Barnette v. Doyle*, Wyo., 622 P.2d 1349, 1362 (1981), we defined the term "culpable negligence" as "willful and serious misconduct." We defined the term "willful" in this context as "'such as is done purposely, with knowledge—or misconduct of such a character as to evince a reckless disregard of consequences.'" *Id.*, quoting *Hamilton v. Swigart Coal Mine*, 59 Wyo. 485, 143 P.2d 203, 206, 149 A.L.R. 998 (1943).

> The aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind. In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm. State of mind, of course, may be difficult to prove. Accordingly, courts allow a party to establish that willful misconduct has occurred by demonstrating that an actor has intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow.

*Id.* at 1136 (citations omitted), *quoted in Stephenson v. Pacific Power & Light Company*, 779 P.2d 1169, 1174–75 (Wyo. 1989), and *Johnston*, 758 P.2d at 568–69.

Baros argues that the materials in the record are sufficient to structure genuine factual issues as to Wells' culpable negligence in several respects. First, he asserts that Wells had been drinking alcoholic beverages. Wells stated in his deposition that he had not anticipated working that day and that he had had one beer at home before being called out on the job. Other than his observation of two empty beer cans in Wells' pickup, Baros presented no evidence that Wells had been drinking, and

---

1. Although Baros stated that Wells had directed him to remain in the ditch while the backhoe was operating, Wells testified in his deposition that he erred in allowing Baros to remain in the hole. For purposes of summary judgment review, we accept the version offered by Baros.

2. The current exclusive remedy provision of the Wyoming Worker's Compensation Act, Wyo. Stat. § 27–14–104 (1977), eliminates co-employee liability for culpable negligence.

he admitted in his deposition that he had no knowledge of Wells drinking on the day of the accident, even though the men worked side by side for several hours before the accident. Baros does not claim that Wells was in any way impaired or under the influence of alcohol, and, even given the benefit of all favorable inferences, this evidence simply fails to structure a factual issue of willful misconduct.

Second, Baros relies upon Wells' deposition testimony that Baros' presence in the excavation was contrary to safety policy established by Wells. As previously noted, there is a conflict in the testimony as to whether or not Wells directed Baros to remain in the hole at the time of the accident. In describing Baros' presence in the excavation, Wells testified:

A * * * I should have thought of it at the same time but I didn't. We were tired, and it was getting late. Ray had been in and out of the hole several times. Ray could have just as easily have got out of the hole and then motioned me into the hole as do what he did: stayed in the hole, then motioned me into it.

Q He should have stayed in the hole?

A No, he should have got out of the hole.

Q Why do you say that?

A It is standard operating practices that if you don't have room enough to get away from a backhoe in a hole, stand away at the end of the bucket or whatever, you get out of the hole.

Q Is that standard operating practice for whom?

A For the city, my crew.

Q Where does that policy originate?

A From me.

Q You are responsible for that policy?

A Yes. It is unwritten, but everybody knows about it.

In describing the procedure used to dig the hole, Baros testified:

Q So you had not been in the ditch at all that day?

A I was coming in and out.

Q Coming in and out, and you would get out when the backhoe was going to scrape dirt?

A When dirt was piled up big enough for the backhoe to be in there, I would crawl out of there, and he would go in there and clean it out.

*    *    *    *    *    *

Q Was that a standard procedure, that you would get the dirt piled up big enough for the backhoe to get it out, and then what you would do is you would get out of the ditch and let the backhoe do it?

A That's right.

With respect to his presence in the hole at the time of the accident, Baros stated:

I would say he made about five or six passes through there, and he stopped. So I went back down there, down in the thing, and he told me, he says, "Ray, Hell, I wouldn't be coming in and out of there." He said, "Just stand off to one side." And he says, "Hell, I won't hit you anyway."

In a later affidavit, Baros stated that it was his perception that, if he had climbed out of the ditch against Wells' direction, he might have lost his job. At the time of his deposition, however, Baros testified:

Q And do you think that you would have gotten fired if he had said, "You don't need to get out of the ditch," and you did?

*    *    *    *    *    *

A Well, from my experience I would say there is a doubtful on that because me and him are good friends, but, other places you probably would have.

We agree with the district court that, while this evidence might well establish negligence on the part of Wells and, for that matter, Baros, it does not make out a case of culpable negligence against Wells. Baros' testimony as to his perception that he would lose his job if he came out of the hole has no bearing on the question of whether Wells possessed the requisite state of mind for a finding of culpable negligence. The evidence indicates the men had been working for several hours and were

near the end of the task. They were tired, and they, particularly Wells, relaxed the usual safety precautions. While Wells' conduct may have been unreasonable, culpable negligence "involves more than unreasonable conduct; it involves willfulness." *Bryant,* 728 P.2d at 1137.

The same can be said regarding Baros' claim that Wells sent him into the hole knowing the backhoe was in need of maintenance. The evidence was undisputed that, while Wells (and Baros) had known for some time of the tendency of the boom to drift to the left, he had no reason to anticipate that it would malfunction in the manner which it did. In his deposition, Wells stated that he did not know the problem with the backhoe was serious and that the drifting itself was not dangerous. Wells testified that he had reported the drifting to the Town's mechanic, but it had not been repaired due to work pressures and scheduling conflicts. In his affidavit, Wells stated that the sudden jump of the backhoe had never happened before to him or any of the other operators. Baros' deposition is to the same effect. He stated that he had operated the backhoe and was aware of the drifting but that he had no knowledge of any tendency of the backhoe to "jump." Again, the evidence of failure to properly maintain, while it undoubtedly would support a claim of negligence, does not demonstrate that Wells "intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow." *Bryant,* 728 P.2d at 1136.

Baros also argued that the evidence demonstrates that Wells was hurried and tired. There is nothing in the record indicating Wells was in a hurry. While Wells did state that both men were tired, we do not believe that fact alone supports an inference that Wells was so fatigued as to be incapable of operating the backhoe safely and that, knowing of the risk, Wells recklessly disregarded the consequences of Baros. *See Johnston,* 758 P.2d 566.

Finally, Baros relies upon an accident investigation report prepared for the municipality's director of public works in which the investigation committee concluded that the practice of having a worker in a hole being excavated by a backhoe is "extremely dangerous."[3] Baros apparently contends that the conclusion reached by the committee is sufficient to structure a genuine factual issue which precludes summary judgment on the question of culpable negligence. A party opposing a motion for summary judgment must come forward with specific facts to show that there is a genuine issue. Conclusory statements are insufficient. *Pace v. Hadley,* 742 P.2d 1283 (Wyo.1987); *Stundon v. Sterling,* 736 P.2d 317 (Wyo.1987). Even if we were to agree that this activity was extremely dangerous, that does not equate to culpable negligence. There is nothing in the record to indicate that Wells anticipated or realized the serious nature of the risk involved or that he willfully disregarded such risk.

Baros argues that the facts in this case are analogous to those in *Poulos v. HPC, Inc.,* 765 P.2d 364 (Wyo.1988), wherein we held that an issue of culpable negligence should have been presented to the trier of fact. In that case, the record suggested a supervisor was aware that a frac tank contained toxic fumes and nonetheless sent a worker in to clean it. The worker died as a result of exposure to the fumes. We determined in *Poulos* that the plaintiff had presented evidence creating a genuine factual dispute as to whether the supervisor was aware of the highly dangerous situation. *Id.* at 367.

Baros has not made such a showing in the instant case. More applicable to the case at bar, in fact, are our comments in *Poulos* with respect to the two defendants for whom we sustained summary judgment. We noted that, while the evidence regarding those defendants may have indicated negligence, it did not demonstrate a

---

3. With respect to this report, we note that the investigating committee reported that Baros informed them it was common practice for a worker to be in the excavation while the backhoe was operating. Additionally, the committee also stated that Baros should have known better than to be in the hole in the first place while the equipment was in operation.

state of mind consistent with culpable negligence which requires knowledge of a high probability of harm. We said that, although both of those defendants were aware of the possibility of harm, there was no evidence suggesting they knew the degree of danger presented by the particular frac tank in which the plaintiff died. *Id.* at 366. Similarly, in the case at bar, there is no evidence that Wells was aware of the degree of danger presented by the defective backhoe under the circumstances; i.e., that there was a high probability of harm. Thus, Baros failed to present a genuine factual issue on the requisite state of mind, and Wells was entitled to a judgment as a matter of law on the claim of culpable negligence.

Affirmed.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

This is another case which upholds a summary judgment entered against an injured employee who sued a co-employee for culpable negligence. The majority approves the procedural disposition without jury trial and I do not. I dissent because the majority confuses the "most beneficial inference standard" with the burden of proof which this plaintiff must bear at trial. The majority sets up a standard of review for summary judgment and then, by result, does not follow the established standard.

The question of culpable negligence being decided by summary judgment has been a recent source of considerable review by this court commencing with *Barnette v. Doyle*, 622 P.2d 1349 (Wyo.1981) and followed by *Bryant v. Hornbuckle*, 728 P.2d 1132 (Wyo.1986); *Stundon v. Sterling*, 736 P.2d 317 (Wyo.1987); *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722 (Wyo. 1987); *Pace v. Hadley*, 742 P.2d 1283 (Wyo. 1987); *Wessel v. Mapco, Inc.*, 752 P.2d 1363 (Wyo.1988); *Johnston v. Conoco, Inc.*, 758

P.2d 566 (Wyo.1988); *Poulos v. HPC, Inc.*, 765 P.2d 364 (Wyo.1988); and *Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169 (Wyo.1989). Comparable cases considering culpable negligence as a defense to the payment of worker's compensation benefits to the employee are *Matter of Meredith*, 743 P.2d 874 (Wyo.1987); *Smith v. Brannan Motor Co.*, 72 Wyo. 1, 260 P.2d 757 (1953); *Hamilton v. Swigart Coal Mine*, 59 Wyo. 485, 143 P.2d 203 (1943); and *Fuhs v. Swenson*, 58 Wyo. 293, 131 P.2d 333 (1942).[1] Here we must find a place to sandwich this case between our affirmed summary judgment cases, *Johnston*, 758 P.2d 566; *Stundon*, 736 P.2d 317; and *Bryant*, 728 P.2d 1132, and our reversed summary judgment cases, *Stephenson*, 779 P.2d 1169; *Poulos*, 765 P.2d 364; and *Wessel*, 752 P.2d 1363.

In analysis of intrinsic facts of each of these cases, it is my conclusion that the majority cognitively *weighs the evidence* to justify summary judgment and fails to confine the review to considering *whether an issue of culpable negligence is presented by the evidence* and any fair inferences to be derived from that evidence. *Baldwin v. Dube*, 751 P.2d 388 (Wyo.1988); *Davenport v. Epperly*, 744 P.2d 1110 (Wyo.1987); *Greenwood v. Wierdsma*, 741 P.2d 1079 (Wyo.1987); *Bryant*, 728 P.2d 1132. By way of quick example, the record shows the superintendent had a beer before being called out on the job. The majority misses the point when they say "this evidence simply fails to structure a factual issue of willful misconduct." The inference most favorable to the plaintiff is the jury could infer the superintendent "intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow" by going onto a potentially dangerous job site after drinking. *Bryant*, 728 P.2d at 1136. The weight to be given should be a jury decision and it could be nominal, modest, or

---

**1.** *See generally* Annotation, *Willful, Wanton, or Reckless Conduct of Coemployee As Ground of Liability Despite Bar of Workers' Compensation Law*, 57 A.L.R.4th 888 (1987) and Annotation,

*Right to Maintain Direct Action Against Fellow Employee For Injury or Death Covered by Workmen's Compensation*, 21 A.L.R.3d 845 (1968).

major. The one issue of summary judgment review is simply whether there is viable evidence sufficient to permit a jury to consider the existence of culpable negligence of the co-employee. *Cordova v. Gosar*, 719 P.2d 625 (Wyo.1986).

This majority accepts as true that the superintendent, under the disclosed circumstances, operated a backhoe which he knew was malfunctioning and ordered a worker into a hole being cleared by that malfunctioning backhoe. That backhoe severely injured the employee. The majority upholds the summary judgment against the injured worker after reportedly giving him "the benefit of all favorable inferences which may fairly be drawn from the record." *See Doud v. First Interstate Bank of Gillette*, 769 P.2d 927 (Wyo.1989). The effect of that holding is to say a jury could not possibly infer the superintendent "intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow." *Bryant*, 728 P.2d at 1136. The record is unchallenged of known danger, high probability in accident from unjustified risk, knowing direction, and what was written by the stars did then occur. Damage injury followed danger, direction and disregard.

The evidence upon which a jury could find more than casual negligence include the superintendent's knowing operation of a malfunctioning backhoe after ordering a fellow employee into the excavation hole when doing so was a violation of the safety standard for such sewer work. Also in evidence was that both participants were tired. The jury might have reasonably inferred the superintendent hurried his work while abandoning acknowledged safety precautions.

Clearly, the known history of the unrepaired backhoe to "jump" and the "jump" that severely injured the employee may have some relation to the superintendent's state of mind or his disregard to an obvious danger. The testimony of the supervisor explained:

Q. Did you do anything—what did you do to cause the injury?

A. What did I do to cause the injury?

Q. Yes.

A. I made a mistake by letting him stay in the hole.

Q. What else?

A. That's it.

Q. Why did the backhoe hit him?

A. It malfunctioned.

Q. How did it malfunction?

A. It malfunctioned hydraulically to where there was no pressure against one cylinder, and the backhoe had started to drift, and when I corrected it, it jumped due to the fact there was no back pressure against one cylinder that was leaking.

There was an obvious conflict in the supervisor's comment that the jump was unexpected and the accident committee's investigation report:

It is generally agreed that there was a mechanical problem with the backhoe, and that all of the operators were aware of it and used it accordingly. In this case, the operator overcompensated in trying to correct the "drift" of the bucket, causing it to strike the man in the hole. Although the mechanical problem with the backho[e] did not actually cause the accident, it was a contributing factor as to why the accident occured [sic]. Therefore, in addition to a mechanical problem, there was a physical error made, which can be explained.

As explained by the employee in the ditch with regard to his directions and as to what occurred at the time of his injury:

Q. When you are told you [sic] to do something—what did [your supervisor] say?

A. He said, "I wouldn't be running up and down this dam [sic] pile of dirt. Just get off to one side. I won't hurt you." I didn't say yes or no or nothing, just went up to that little corner and stayed there with my shovel, and I just sat there and watched him operating it because there

was a lot of dirt that had caved in, and he was shoveling all that dirt out.

The employee also indicated:

A. Well, I learned that when we was digging that hole out, it had caved in about three to four more feet south of our regular main ditch, so, actually, it left us a wide area to work on, so when it did it covered our pipe that had already just discovered. With a shovel he came back down there, and he was cleaning. I would say he made about five or six passes through there, and he stopped. So I went back down there, down in the thing, and he told me, he says, "Ray, Hell, I wouldn't be coming in and out of there." He said, "Just stand off to one side." And he says, "Hell, I won't hit you anyway." So I said okay, and I started digging, and dug, and I went off the one bank. There was a little bank on the corner of that. For example, this is the hole. There was a little bank right here, and this is where I stood up.

\* \* \* \* \* \*

Q. Now, what were you doing when you got hit with the backhoe?

A. I couldn't tell you if I was standing up or laying down or what. All I can remember is I didn't have no—I didn't even know if I was breathing. All I know is I felt a hand here like the good Lord had grabbed ahold of me.

Q. Indicating your right arm. You felt a hand?

A. Yes.

Q. Was that [your supervisor's] hand?

A. Yes, because he was out on top, and I was catching my wind.

Q. That was after you got hit?

A. Right.

Q. What were you doing when you got hit?

A. I was standing there on that corner like I stated before, and I was watching him take the dirt out.

Q. Taking the dirt out?

A. Right.

Q. And you saw the backhoe come at you?

A. No, I didn't. I was looking at him. When he brought the bucket like this, I was watching him.

Thereafter, the employee explained in some detail that he was looking up at the operator and equipment and never saw the bucket swinging before it hit him.

Before he injured the worker, the superintendent violated his own safety policy:

A. It is standard operating practices that if you don't have room enough to get away from a backhoe in a hole, stand away at the end of the bucket or whatever, you get out of the hole.

Q. Is that standard operating practice for whom?

A. For the city, my crew.

Q. Where does that policy originate?

A. From me.

Q. You are responsible for that policy?

A. Yes. It is unwritten, but everybody knows about it.

I would conclude a case is appropriate for a jury to decide when this court begins factfinding during culpable negligence review if our frequently stated criteria of summary judgment, *Davenport*, 744 P.2d 1110, is going to be said to have precedence.

Accordingly, I dissent.