2012 WY 12

**SHEPHERD OF the VALLEY CARE CENTER, Appellant (Respondent),**

v.

**Rebecca K. FULMER, Appellee (Petitioner).**

No. S–10–0236.

Supreme Court of Wyoming.

Feb. 2, 2012.

Representing Appellant: Scott P. Klosterman of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Representing Appellee: Peter J. Timbers of Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Rebecca K. Fulmer (Fulmer) suffered injuries on two separate dates while working as a Certified Nursing Assistant (CNA) at Shepherd of the Valley Care Center (Shepherd). She submitted worker's compensation claims for both injuries. Shepherd objected to both claims, and the Wyoming Workers' Safety and Compensation Division (Division) denied benefits for the two injuries.

[¶ 2] Fulmer requested a hearing, and following a combined contested case hearing, the Office of Administrative Hearings (OAH) upheld the denial of benefits. The OAH concluded Fulmer was not entitled to benefits for her first injury because it was the result of Fulmer's own culpable negligence. It concluded Fulmer was not entitled to benefits for the second injury based on its finding that "Fulmer was performing activities of daily living not causally related to her work and the fracture could have become complete at any time or place."

[¶ 3] Fulmer appealed, and the district court reversed the OAH decision. The district court found the record did not support either the finding that Fulmer's first injury was caused by her own culpable negligence or the finding that Fulmer's second injury

was caused not by her work but by normal activities of day-to-day living. We affirm the decision of the district court and hold that Fulmer is entitled to benefits for both of her August 2008 injuries.

## ISSUES

[¶ 4] The Division did not appeal the district court's decision. Shepherd presents the following issues on appeal:

A. Whether the hearing examiner correctly determined that the injury sustained by Rebecca Fulmer on August 12, 2008, was caused by her culpable negligence and therefore [was] not a compensable injury as defined under Wyo. Stat. § 27–14–102(a)(xi).

B. Whether the hearing examiner correctly determined that the injury sustained by Rebecca Fulmer on August 30, 2008, resulted primarily from normal activities of day-to-day living and therefore [was] not a compensable injury as defined under Wyo. Stat. § 27–14–102(a)(xi).

## FACTS

[¶ 5] Fulmer began working as a CNA at Shepherd on May 22, 2006. On the morning of August 12, 2008, Fulmer and another CNA, Seth Darrison, performed a two-person transfer of a Shepherd patient from the patient's bed to the bathroom. During this lifting procedure, Fulmer and Darrison heard Fulmer's hip pop, and Fulmer felt pain in her right hip. After Fulmer and Darrison transferred the patient from the bathroom to a recliner, Fulmer consulted with Mary Riggs, a physical therapy assistant who also works at Shepherd. Riggs massaged and "popped" Fulmer's right hip back into place. Fulmer then continued working with Darrison to complete two-person transfers of around seven or eight additional patients.

[¶ 6] Sometime during the afternoon of August 12, 2008, Fulmer performed a transfer of another patient from her wheelchair to her bed. Fulmer performed this transfer by

herself, even though the patient care instructions for the patient warned that the patient was at high risk for falls and directed that the patient be transferred using two CNAs and a Hoyer Lift. After Fulmer completed the transfer of this patient, she began to experience severe pain in her right hip. Before leaving work that day, she saw Riggs again, and Riggs repeated the procedure she had performed earlier in the day.[1]

[¶ 7] On August 15, 2008, Fulmer saw Dr. Christopher Snyder for treatment of her right hip pain. Dr. Snyder diagnosed an "acute right lumbar strain with right lumbar neuroradiculitis." X-rays of Fulmer's right hip and lumbar spine on August 15, 2008, showed no evidence of an acute abnormality and no evidence of inflammatory arthritis or significant degenerative change. Dr. Snyder prescribed muscle relaxants and anti-inflammatory and pain medications, and kept Fulmer off work for seventy-two hours with a return thereafter to light duty.

[¶ 8] On August 30, 2008, Fulmer returned to light duty at Shepherd. Her light-duty responsibilities included passing ice and water to residents, assisting in the dining room, and assisting in making beds. In the afternoon, Fulmer was passing ice and water to the Shepherd residents, a task that involved pushing an ice cart through the halls, emptying pitchers in the rooms, and refilling those pitchers with ice and water. While performing this task, Fulmer felt her hip snap and fell to the floor.

[¶ 9] Fulmer was taken to the Wyoming Medical Center, diagnosed with a fractured right hip and underwent surgery performed by Dr. Clayton Turner. Dr. Turner diagnosed Fulmer as follows:

1. Displaced right femoral neck fracture.
2. Questionable history of right femoral neck stress fracture, which was completed with acute displacement on August 30, 2008, versus a pathologic process that may result in bone weakening.

---

1. Riggs did not recall that she saw Fulmer twice on August 12, 2008. She recalled only the afternoon procedure she performed on Fulmer. We acknowledge the discrepancy but find it has no bearing on our analysis. Additionally, we note that the OAH findings of fact indicate two treatments by Riggs, one in the morning and one in the afternoon.

[¶ 10]   Fulmer sought worker's compensation benefits for both the August 12th and August 30th injuries to her right hip.   On March 15, 2009, Dr. Anne MacGuire performed an independent medical evaluation (IME).   Dr. MacGuire concluded that Fulmer's August 12, 2008, hip injury was a work injury.   She concluded that Fulmer's August 30, 2008, injury was not work related based on the following observations:

> The pathologic report completed postoperatively documented the claimant has osteoporosis of the right hip.   In my opinion, this was a fatigue fracture.   Reviewing the definitions of injury and I quote from the information provided to me from the division of Workers' Safety and Compensation (xi "Injury means any harmful change in human organism other than normal aging and includes damage to or loss of any artificial replacement and death arising out of and in the course of employment while at work in or about in the premises occupied, etc").   The claimant was at work, but her fatigued fracture of her right hip is a normal aging process and while it occurred on the job was not due to any unusual or specific employment-related activity.   The claimant has risk factors for osteoporosis, which include multiparity and vitamin D deficiency.
>
> \* \* \* \*
>
> The claimant suffered [a] fragility fracture. It is my impression this fracture could have occurred at any time, and since she was not in the act of bending, twisting, or lifting, there does not appear to be an occupational cause for her fragility fracture.
>
> \* \* \* \*
>
> By history to Dr. Iverson and Dr. Turner, the claimant was walking passing out ice. This would be activity considered normal during one's active day.   The fact that she was walking is not a particular function of her job.   The fragility fracture could have occurred at home getting in and out of a car or going to the grocery store.   The medical record does not provide evidence of any work-related activities that contributed to the fragility fracture suffered by Ms. Fulmer on 08/30/08.

[¶ 11]   Dr. Turner, Fulmer's treating orthopedic surgeon, disagreed with Dr. MacGuire's conclusions.   Dr. Turner testified that while tests showed that Fulmer had a vitamin D deficiency, she had not been diagnosed with osteoporosis, and many people have low vitamin D levels without osteoporosis.   Dr. Turner disagreed that Fulmer suffered a fatigue fracture.   It was his opinion that the August 12, 2008, injury caused a stress fracture that was missed on the earlier x-rays because the radiologist was not specifically looking for it.   Dr. Turner concluded that Fulmer's twisting or pivoting during the task of passing out ice and water caused the fracture to complete.

[¶ 12]   Shepherd objected to Fulmer's worker's compensation claims for both the August 12, 2008, injury and the August 30, 2008, injury.   On October 3, 2008, the Division issued a final determination denying benefits for the August 12, 2008, injury.   The Division denied benefits for the first injury on the ground that Fulmer's injury did not meet the definition of injury as defined by Wyo. Stat. Ann. § 27–14–102(a)(xi).   On July 16, 2009, the Division issued a final determination denying benefits for the August 30, 2008, injury.   The Division denied benefits for the second injury on the ground that Fulmer's "hip fracture was not due to an extra-hazardous work activity.   It occurred while performing an activity of daily living and was caused by a stress fracture due to an underlying medical condition."

[¶ 13]   Fulmer requested a hearing, and the two benefit denials were combined for a contested case hearing.   The OAH upheld the denial of benefits for both injuries.   The hearing examiner concluded that Fulmer's August 12, 2008, injury occurred when Fulmer transferred a patient by herself, in violation of her employer's policy, and was therefore the result of her own culpable negligence and not compensable.   With respect to the August 30, 2008, injury, the hearing examiner accepted the opinion of Dr. MacGuire and concluded the injury was the result of a normal activity of day-to-day living, not Fulmer's work, and was therefore likewise not compensable.

[¶ 14] Fulmer appealed, and the district court reversed. The district court concluded that the hearing examiner's finding of culpable negligence as a basis to deny benefits for the August 12, 2008, injury was not supported by substantial evidence. The district court further concluded that the hearing examiner misapplied the law in finding that Fulmer's August 30, 2008, injury resulted from a normal activity of day-to-day living.

## STANDARD OF REVIEW

[¶ 15] We review administrative decisions based on the factors set forth in the Wyoming Administrative Procedure Act, which provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2011).

■ [¶ 16] When factual findings are challenged, " 'we will affirm those findings if they are supported by substantial evidence.' " *McCall–Presse v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 34, ¶ 6, 247 P.3d 505, 509 (Wyo.2011) (quoting *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶ 26, 49 P.3d 163, 173 (Wyo.2002)). In regard to the interpretation and application of law, we have stated:

The interpretation and correct application of the provisions of the Wyoming Workers' Compensation Act are questions of law over which our review authority is plenary. Conclusions of law made by an administrative agency are affirmed only if they are in accord with the law. We do not afford any deference to the agency's determination, and we will correct any error made by the agency in either interpreting or applying the law.

*Wyoming Workers' Safety & Comp. Div. v. Faulkner*, 2007 WY 31, ¶ 10, 152 P.3d 394, 396 (Wyo.2007) (quoting *Bailey v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 145, ¶ 9, 55 P.3d 23, 26 (Wyo.2002)).

■ [¶ 17] In an appeal from a district court's appellate review of an administrative decision, we review the case as if it came directly from the hearing examiner, affording no deference to the district court's decision. *Deloge v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 154, ¶ 5, 264 P.3d 28, 30 (Wyo.2011); *In re Kaczmarek*, 2009 WY 110, ¶ 7, 215 P.3d 277, 280 (Wyo.2009).

## DISCUSSION

### August 12, 2008, Injury: Culpable Negligence

[¶ 18] The hearing examiner found that although Fulmer did experience a popping and discomfort in her right hip when performing the day's first two-person transfer with her co-worker Darrison on the morning of August 12, 2008, the diagnosed injury for which she received treatment occurred when she performed a solo transfer of a patient later in the day. The hearing examiner further found that the patient care instructions mandated a two-person transfer for that particular patient, that Fulmer's use of a solo transfer was a direct violation of those in-

structions, and that such a violation was "clear evidence" of culpable negligence. On that basis, the hearing examiner upheld the denial of benefits for Fulmer's August 12, 2008, injury.

[¶ 19] Because the record contains evidence to support the hearing examiner's finding that Fulmer's August 12th injury occurred during the transfer she performed by herself in the afternoon of that day, we will defer to that finding. *See Huntington v. State ex rel. Wyo. Workers' Comp. Div.,* 2007 WY 124, ¶ 11, 163 P.3d 839, 842 (Wyo.2007) (resolving ambiguities or inconsistencies in the record by weighing evidence and assessing witness credibility is the trier of fact's responsibility and not the prerogative of the reviewing court). Where we part ways with the hearing examiner is in his finding of culpable negligence.

[¶ 20] A claimant must prove all essential elements of her claim for worker's compensation benefits. *Keck v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 985 P.2d 430, 433 (Wyo.1999). Once a claimant meets that burden, then the burden shifts to the party opposing benefits to establish an exclusion from worker's compensation coverage. *Id.* The exclusion at issue with respect to Fulmer's August 12th injury is the "culpable negligence" exclusion. Specifically, the Wyoming Workers' Compensation Act (Act) excludes from the definition of injury any injury "due solely to the culpable negligence of the injured employee." Wyo. Stat. Ann. § 27–14–102(a)(xi)(C) (LexisNexis 2011).

[¶ 21] The term "culpable negligence" means "willful and serious misconduct." *Brebaugh v. Hales,* 788 P.2d 1128, 1136 (Wyo.1990). "Willful" means that the misconduct was done "purposely, with knowledge," or that the misconduct was "of such a character as to evince a reckless disregard of consequences." *Id.* To be culpable negligence, an act must be "intentional, unreasonable and taken in disregard of a known or obvious risk so great as to make it probable injury will follow." *Martin v. Alley Const., Inc.,* 904 P.2d 828, 832 (Wyo.1995). It requires more than a finding of unreasonable

conduct. *Baros v. Wells,* 780 P.2d 341, 343 (Wyo.1989). A finding of culpable negligence requires "an extreme departure from ordinary care in a situation where a high degree of danger is apparent." *Martin,* 904 P.2d at 832.

[¶ 22] Thoughtless, heedless, or inadvertent acts or mere errors in judgment or simple inattention do not constitute culpable negligence. *Martin,* 904 P.2d at 832; *see also Brebaugh,* 788 P.2d at 1136–40 (supervisor who instructed crew to make repairs to conveyor belt in coal mine without training or supervision not guilty of culpable negligence). The party claiming culpable negligence must prove that the claimant was acting with a state of mind that approaches intent to do harm to him or herself. *Brebaugh,* 788 P.2d at 1136. This may be established by a showing that the claimant has intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow. *Id.; see also Weidt v. Brannan Motor Co.,* 72 Wyo. 1, 260 P.2d 757 (1953) (employee who drove company vehicle on company business at speeds of eighty to ninety miles per hour in violation of posted forty-five mile per hour speed limit guilty of culpable negligence).

[¶ 23] With this guidance in mind we turn to the OAH decision. The hearing examiner made the following findings to support his conclusion that Fulmer's August 12, 2008, injury was caused by her own culpable negligence:

> 5. The Resident Care Plan for [patient][2] clearly required a two person assist for all transfers as [patient] was a patient with high risk for falls.
> * * * *
> 16. ... Fulmer admitted [patient] is a two person transfer but she did a one person transfer to speed things up.
> * * * *
> 20. The evidence established Fulmer sought medical treatment and was diagnosed with an acute lumbar strain and right lumbar neuroradiculitis from transferring a patient by herself. From the

**2.** In the interests of patient privacy, we have redacted patient names from our discussion.

evidence presented it appears Fulmer had some discomfort in the morning but actually suffered an injury while transferring [patient] by herself in direct violation of the required two person transfer. This is clear evidence of culpable neglect and benefits should be denied for the August 12, 2008, alleged injury. It should also be noted the medical records are somewhat unclear as to the exact injury Fulmer sustained on August 12, 2008.

[¶ 24] The hearing examiner's basic findings of fact were essentially that Fulmer knew the patient required a two-person transfer, and she nonetheless performed a one-person transfer. Although the hearing examiner did find that the patient care plan identified the patient as being at a high risk for falling, he did not make the necessary follow-up findings regarding Fulmer's understanding of the risk of harm to herself were she to perform a one-person transfer rather than the required two-person transfer. Specifically, the hearing examiner made no findings as to what Fulmer knew or understood from reading the plan, no findings as to what Fulmer should have known or understood from the plan, and no findings as to whether Fulmer customarily read patient care plans or had ever read this particular patient's care plan.

[¶ 25] We recognize that in this case such findings would have been difficult for the hearing examiner to make. Although Fulmer testified, she was not asked questions concerning her understanding of the patient care instructions for the particular patient involved, her understanding of transfer techniques or her understanding of the risk in not using proper techniques. In so observing, we do not mean to suggest that a claimant's testimony is the only viable evidence to make this proof. Other evidence could have included Shepherd's policies on performing patient transfers, its policies on its employees reading, understanding, and adhering to patient care plans, its training of employees on these issues, and any warnings Shepherd issued concerning risks of an employee ignoring or violating the policies or patient care instructions, with respect to either employee and patient safety or employee discipline.

Unfortunately, the record is devoid of such evidence. As the district court observed, the record simply does not contain any evidence from which a trier of fact could find that Fulmer acted in disregard of a known or obvious risk so great as to make it probable injury would follow:

First, there is nothing in the record to show why this policy was adopted; specifically, whether it was for the protection of the patient or for the protection of the health care worker or both. If Fulmer violated a policy that was in place to protect a patient, her violation would not be evidence of negligence, let alone culpable negligence. Secondly, there is nothing to show that Fulmer was aware that violation of the policy would likely result in an injury to her. The record is totally devoid of any indication that violation of the policy would lead to Fulmer's injury or that Fulmer was aware of such risks. If the risk was not identified and if there was no showing that Fulmer was aware of the risk, it cannot be said that she acted in disregard of a known or obvious risk so great as to make it probable injury will follow.

[¶ 26] Shepherd attempts on appeal to avoid the district court's reasoning and bolster the hearing examiner's culpable negligence finding by supplying its own interpretation of the record. On pages 16–17 of its brief, Shepherd argues:

On August 12, 2008, Fulmer **volunteered** to perform "doubles" or "two-person" transfers of residents along with co-employee Seth Darrison. (Record Vol. III at p. 16). By volunteering to perform "doubles" or "two-person" transfers of residents, Fulmer was uniquely aware that the residents that she would be transferring that day required the assistance of two CNA's. Furthermore, as an experienced and well trained CNA, Fulmer knew and understood: (1) the different transfer techniques to be used with certain residents; (2) that the resident care plan established for each resident was to be strictly followed; (3) the purpose for following the transfer technique set forth in the resident's care plan is to protect both

the resident and SVCC employees from injuries; and (4) failing to follow the transfer technique in the resident's care plan is an obvious risk that would make it highly probabl[e] that harm would result. (Record Vol. II at pp. 0271, 0283–0284, 0327). Finally, Fulmer admitted that she knew the resident . . . was a "two-person" transfer. (Record Vol. III at pp. 51–52).

(Emphasis in original.)

[¶ 27] We reject Shepherd's argument for two reasons. First, Shepherd is asking this Court to stand in the place of the hearing examiner and make basic findings and evidence assessments that the hearing examiner did not make. That is something this Court will not do. The Wyoming APA requires the hearing examiner to make findings of basic facts upon all material issues and upon which his ultimate findings of fact or conclusions are based. *Rodgers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 65, ¶ 32, 135 P.3d 568, 579 (Wyo. 2006) (citing *FMC v. Lane*, 773 P.2d 163 (Wyo.1989) and Wyo. Stat. Ann. § 16–3–110). "Appellate briefing is not the place to articulate sufficient findings of fact. It is not the duty of this Court to analyze and assess evidence presented to an administrative body to determine the weight to be given evidence or the credibility to be afforded witnesses." *Rodgers*, ¶ 29, 135 P.3d at 579; *Decker v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 160, ¶ 35, 124 P.3d 686, 697 (Wyo.2005).

[¶ 28] Second, even if this Court were to put itself in the role of hearing examiner and search the record to glean basic findings that might lend support to the hearing examiner's ultimate conclusion, we do not agree with Shepherd's interpretation of the evidence. Shepherd directed this Court to the following testimony excerpts to support the hearing examiner's decision:

*Testimony of Seth Darrison, Shepherd CNA :*

A. Rebecca had asked me to assist her with the resident, [name omitted], in order to get her safely on to the toilet. It was a two assist resident so at that point at that particular time, I was wearing gloves because I was going to be pulling down her pants and removing her Depends for when she did sit on the toilet so she could go.

*Testimony of Roger Furhman, Shepherd Physical Therapist :*

Q. Are you familiar with pivot transfers that people here perform on patients?

A. Yes.

Q. Are those potentially dangerous to the person performing the transfer?

* * * *

A. A pivot transfer by definition is a stand and turn transfer. You're pivoting from one location to the other location. In the vagueness of that, a pivot transfer can go from hands on or from no assistance to needing extensive assistance. It's part of any of the training of any CNA. It's the way that basically any resident here is transferred unless they're a mechanical transfer. So is it inherently dangerous? Walking across the floor can be dangerous. A pivot transfer if done properly and done as instructed should carry a very low risk of injury to either the patient or the transfer. That's why we come up with transfer techniques, transfer training instruction.

Q. Have you seen CNAs or other people that perform pivot transfers injured doing a pivot transfer?

A. There's injuries all the time on people doing transfers. I mean, that's somewhat the nature of the job, but again, if transfers are done per protocol, if they're done per training, the risk level is low, but it's—there's an inherent risk in the job.

Q. So your answer is yes, you've seen people injured or no, you haven't?

A. Yes. I have seen people that have been injured.

*Testimony of Danielle Wagner, Shepherd Employee :*

Q. You mentioned that you had training in how to transfer a patient?

A. Uh-huh.

Q. What sort of principles are important in that training?

* * * *

Q. Can you think of any principles that would be important to you in you wanting to transfer a patient?

* * * *

Q. Does the question make sense to you?

A. It does make sense to me. The only thing I will say is that we are taught good mechanics for lifting and transferring for the safety of us.

Q. Have you been able to observe Rebecca Fulmer transferring patients?

A. Yes.

Q. Could you comment on her—

A. Yes.

Q.—ability to do this?

A. By the book. And what I mean by the book, I mean if it takes two people, she will do two people. If it says to use a particular transfer technique with two people with the Hoyer sling, she will do that. If it calls for a gate belt, she will do that. Very much the way by the book that we're taught.

[¶ 29] We do not agree with Shepherd that these excerpts support its assertions that Fulmer understood the need to strictly adhere to resident care plans and the obvious risk of harm to herself if she failed to follow lifting instructions. At least one reading of the evidence above suggests that lifting injuries are an inherent risk of the job, and not just a risk of improper transfer procedures. As to Fulmer's specific knowledge, the evidence relied on by Shepherd definitively shows little more than that Fulmer knew how to properly perform patient transfers and did not do so in this instance. As set forth above, thoughtless acts or errors in judgment are not the types of "serious and willful misconduct" that constitute culpable negligence. *See Martin*, 904 P.2d at 832.

[¶ 30] We agree with the district court that this case is more akin to the facts in *Baros*, 780 P.2d 341. In *Baros*, it was alleged that an employee's act of remaining in a hole where a backhoe was excavating, in violation of company policy, was culpable negligence. This Court found no culpable negligence:

> [W]hile this evidence might well establish negligence on the part of Wells and, for that matter, Baros, it does not make out a case of culpable negligence against Wells.

Baros' testimony as to his perception that he would lose his job if he came out of the hole has no bearing on the question of whether Wells possessed the requisite state of mind for a finding of culpable negligence. The evidence indicates the men had been working for several hours and were near the end of the task. They were tired, and they, particularly Wells, relaxed the usual safety precautions. While Wells' conduct may have been unreasonable, culpable negligence "involves more than unreasonable conduct; it involves willfulness."

*Id.* at 344–45.

[¶ 31] Fulmer's testimony regarding her decision to perform a one-person transfer rather than the required two-person transfer was similar. She performed the task toward the end of her shift, and she testified that she performed the task by herself to save time and complete the work faster. As in *Baros*, Shepherd may have established that Fulmer's conduct was unreasonable or inadvisable, but it did not meet its burden of proving that her actions were willful and serious misconduct.

### August 30, 2008, Injury: Normal Activities of Daily Living

[¶ 32] One of Fulmer's tasks as a CNA was to deliver pitchers of water and ice to patients in the nursing home, and Fulmer was performing that task when her hip fractured. Shepherd does not dispute the water and ice delivery was a work-related task. It instead asserts it was the walking portion of the task that caused Fulmer's injury, and because walking is a normal activity of daily living, benefits must be denied. The hearing examiner agreed, and on the basis that injuries caused by normal activities of daily living are excluded from coverage, he upheld the denial of benefits. The district court reversed, observing that if the act of walking in the performance of a task could exclude an injury from coverage, the exclusion might very well swallow the coverage altogether. We agree and hold that the employer did not in this case meet its burden of proving the exclusion should apply.

[¶ 33] The Act excludes from coverage any injury "resulting primarily from the natural aging process or from the normal activities of day-to-day living, as established by medical evidence supported by objective findings." Wyo. Stat. Ann. § 27–14–102(a)(xi)(G) (LexisNexis 2011). This Court first addressed the meaning of the phrase "normal activities of day-to-day living" in *State ex rel. Wyo. Workers' Comp. Div. v. Sparks*, 973 P.2d 507 (Wyo.1999). In searching for a definition, we expressed the following concern with the exclusion:

> The phrase "day-to-day living" is extremely broad and essentially amorphous. We do not know whether it alludes to the daily activities of the employee or the daily activities of the entire population. It indeed is possible for that language to encompass almost any possible human physical effort. We do not assume that, by adopting this language, the legislature intended to abolish worker's compensation benefits in Wyoming. As the hearing examiner pointed out, that could be a possible consequence of adopting the Division's view.

*Id.* at 509.

[¶ 34] Bearing this concern in mind, this Court defined the exclusion in the following manner:

> We are satisfied that when an employee is engaged in activities over which the employer is vested with the right of control, these cannot be normal activities of day-to-day living because the employer has no such right with respect to the normal activities of day-to-day living. Consequently, the statutory phrase would allude to those activities accomplished within the workplace over which the employer is not vested with any right of control. We turn then to what the phrase "right of control" connotes. In *Natural Gas Processing Co. v. Hull,* 886 P.2d 1181, 1185 (Wyo.1994) (emphasis in original), we quoted this language:
>
> > *"The control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work,* as well as of the result * * *."*

41 Am.Jur.2d *Independent Contractors* § 8 (1968).

> It follows that when the employer has the right of control and can tell the employee not only what to do, but how to do it, that is not one of "the normal activities of day-to-day living."

*Sparks,* 973 P.2d at 511.

[¶ 35] We have considered the "normal activities of day-to-day living" exclusion, as so defined, in four cases: *Sparks,* 973 P.2d 507; *Sellers v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 979 P.2d 959 (Wyo. 1999); *Keck,* 985 P.2d 430; and *Yenne–Tully v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 48 P.3d 1057 (Wyo.2002). In all but *Yenne–Tully,* we rejected the exclusion as a basis to deny benefits.

[¶ 36] In *Sparks,* the claimant was working as a hospital nurse when she bent over to pick up a patient's medication from a medicine cart. *Sparks,* 973 P.2d at 508. She experienced severe and sudden pain in her lower back and was diagnosed with a herniated disc in her lumbar region. *Id.* The Division denied benefits on the ground that the act of leaning over to pick up medication from the cart was a normal activity of daily living. *Id.* The hearing examiner in that case rejected the Division's argument and we affirmed, concluding that "[w]hen we examine the factual background of this case, it is clear that the hospital had the right to control the means and manner of the performance of Sparks' tasks as well as the result." *Id.* at 511.

[¶ 37] In *Sellers,* the claimant, a Rock Springs animal control officer, injured her lumbar spine while exiting her work truck. *Sellers,* 979 P.2d at 960. The Division denied benefits on the ground that "the acts of entering and exiting a motor vehicle are normal activities of day-to-day living." *Id.* The hearing examiner affirmed, and we reversed. In so ruling, we observed that a claimant is not required to show some unique work related circumstance or event occurred to take the injury out of an act of everyday living. *Id.* at 962. "The Division, in accordance with the right-of-control test, must present evidence to show that the activity in question is a normal activity of day-to-day living." *Id.*

[¶ 38] In *Keck*, the claimant, a food server, injured her knee when she twisted her body while carrying glasses. *Keck*, 985 P.2d at 431. The pain was not immediately apparent, but after the claimant completed her shift, the knee became painful and swollen, and the claimant was eventually diagnosed with an aggravation of inflammatory arthritis in her knee. *Id.* The Division denied benefits, and the Medical Commission affirmed on the ground that "although her injury aggravated a preexisting condition, the injury was not compensable because twisting is an activity of day-to-day living." *Id.* at 432. We reversed:

> Keck twisted and injured her knee while moving glasses, a job-related activity. Although the Division presented evidence that twisting is an activity of daily living, it failed to meet its burden of offering any right-of-control evidence establishing Keck injured her knee while engaged in an activity beyond her employer's control. The Commission acknowledged that Keck's work injury aggravated an underlying condition. It erred, however, in applying the day-to-day living exclusion, Wyo. Stat. Ann. § 27–14–102(a)(xi)(G), and by deciding Keck's injury was not compensable. We are, therefore, compelled to reverse the Commission's decision because it is not in accordance with law.

*Id.* at 433.

[¶ 39] In *Yenne–Tully*, the claimant worked as a guard at the Wyoming State Penitentiary and submitted a worker's compensation claim for a herniated disc. *Yenne–Tully*, ¶ 3, 48 P.3d at 1059. The claimant suffered a work injury in 1989 when he fell down a flight of stairs, but the herniated disc at issue did not present itself until 1997. *Id.* During that approximately eight-year interim, the claimant continued to work and live a very active life outside work. His life outside work included horseback riding and an incident in which he was dragged by a horse. *Id.* at ¶ 4, 48 P.3d at 1060. Medical testimony established that the cause of the claimant's herniated disc could be attributed approximately seventy percent to the claimant's activities outside work. *Id.* The Division denied benefits, and a hearing examiner affirmed that denial. We likewise affirmed the denial:

> This Court has stated that the phrase "day-to-day living," as used in Wyo. Stat. Ann. § 27–14–102(a)(xi)(G) describes those activities that a worker's employer does not have the right to control. *State ex rel. Wyoming Workers' Safety and Compensation Div. v. Sparks*, 973 P.2d 507, 511 (Wyo.1999). Common actions such as getting out of a car or bending to pick up a pen are not considered activities of day-to-day living when performed in the course of employment. *In re Worker's Compensation Claim of Keck*, 985 P.2d 430, 433 (Wyo.1999); *Sellers v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 979 P.2d 959, 960 (Wyo.1999). Recreational activities, performed outside the workplace, or household chores are beyond the control of the employer and would be characterized as day-to-day living activities. We conclude that the cumulative trauma responsible for the majority of the appellant's injury is attributable to day-to-day living, and the appellant does not have a compensable injury pursuant to Wyo. Stat. Ann. § 27–14–102(a)(xi).

*Yenne–Tully*, ¶ 13, 48 P.3d at 1062–63.

■■■ [¶ 40] Turning to the present case, the hearing examiner, in holding that Fulmer's hip fracture was not compensable, relied on Dr. MacGuire's opinion that Fulmer was engaged in a normal activity of daily living.[3] Dr. MacGuire summarized her opinion as follows:

---

3. As indicated above, there is a dispute in the medical evidence with respect to how Fulmer's hip fractured. Dr. Turner, Fulmer's treating physician, believed the fracture was a stress fracture that started with the August 12th injury and then completed on August 30th. Dr. MacGuire, who performed an IME on Fulmer, believed the hip fracture was a fatigue fracture that resulted from osteoporosis. The hearing examiner weighed the evidence, assessed the opinions of the two physicians, and decided to accept Dr. MacGuire's opinion. The record contains sufficient evidence to support the hearing examiner's acceptance of Dr. MacGuire's opinion over Dr. Turner's opinion, and we agree with the district court that the reviewing court may not substitute its judgment for that of the hearing examiner on which medical opinion to accept. *See Hunting-*

By history to Dr. Iverson and Dr. Turner, the claimant was walking passing out ice. *This would be activity considered normal during one's active day. The fact that she was walking is not a particular function of her job.* The fragility fracture could have occurred at home getting in and out of a car or going to the grocery store. The medical record does not provide evidence of any work-related activities that contributed to the fragility fracture suffered by Ms. Fulmer on 08/30/08. [Emphasis added.]

[¶ 41] As the district court observed, the problem with Dr. MacGuire's conclusion is that it applies the wrong legal standard. To determine coverage, the question that must be answered is whether Shepherd, Fulmer's employer, had the right to control the task in which Fulmer was engaged when she suffered her injury. Dr. MacGuire's opinion does not address this question and therefore cannot, standing alone, provide a basis for finding that a normal activity of daily living caused Fulmer's injury.

[¶ 42] To address the correct legal standard on appeal, Shepherd contends in its brief that "[t]here is simply no evidence that SVCC controlled the details of Fulmer's walking activity. SVCC did not control where Fulmer walked nor did it control how she walked." This argument on appeal likewise misses the crux of our inquiry in these types of cases, and it is further misplaced because it attempts to shift the burden of proof from Shepherd, the party asserting the exclusion, to the claimant.

[¶ 43] Our prior cases in this area have established that "[c]ommon actions such as getting out of a car or bending to pick up a pen are not considered activities of day-to-day living when performed in the course of employment." *Yenne–Tully,* ¶ 13, 48 P.3d at 1062. Our analysis does not parse the mechanics of performing a task to determine whether the employee is engaged in a normal activity of daily living. The question is not whether an employer controls every physical motion of an employee in the performance of an assigned task. The question is whether the employer had the right to control the task the employee was performing when she was injured, including the means and manner of performance. *Id.,* ¶ 13, 48 P.3d at 1062–63; *Keck,* 985 P.2d at 433; *Sellers,* 979 P.2d at 962; *Sparks,* 973 P.2d at 511.

[¶ 44] The question in this case then is not whether Shepherd had a right to control Fulmer's walking, but rather whether it had a right to control the task Fulmer was performing when she suffered a fractured hip. On this point, Shepherd's complaint regarding a lack of evidence rings hollow. Shepherd, as the party asserting the exclusion from coverage, carried the burden of proving the exclusion applied, including the burden of presenting evidence that Shepherd did not have a right to control the means and manner in which Fulmer delivered pitchers of ice and water to patients. *See Keck,* 985 P.2d at 433 (party opposing compensability must produce medical evidence showing that claimant's injury resulted from the normal activities of daily living as well as right-of-control evidence showing the employer had no control over the claimant's activity). Shepherd produced no such evidence.

[¶ 45] What evidence the record does contain on the question of control over Fulmer's water and ice delivery is in fact to the contrary. The delivery of pitchers of ice and water was a duty specifically included in the light duty agreement Shepherd entered into

---

*ton,* ¶ 11, 163 P.3d at 842. We thus base our analysis on the acceptance of Dr. MacGuire's opinion.

We note also that neither the Division nor Shepherd contested Fulmer's claim for benefits on the ground of a preexisting condition, but many references are made to Fulmer's alleged underlying condition of osteoporosis. To the extent that Dr. MacGuire's report may suggest that such an underlying condition is in itself a basis to deny coverage, we of course reject that sugges-

tion. The question of whether Fulmer's preexisting condition was aggravated is not an issue in this case, and the existence of such a condition is not in itself a basis to deny coverage. *See Keck,* 985 P.2d at 431–33 (benefits awarded where twisting motion aggravated underlying arthritic condition); *see also Straube v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2009 WY 66, ¶ 17, 208 P.3d 41, 48 (Wyo.2009) (employer takes employee as it finds him).

with Fulmer on August 20, 2008, ten days before her injury. It was plainly a task she performed at Shepherd's direction. Shepherd did not meet its burden of proving that the task of delivering ice and water to its patients was a normal activity of day-to-day living, and we thus affirm the decision of the district court.

### CONCLUSION

[¶ 46] Shepherd did not meet its burden of proving Fulmer was culpably negligent when she injured her hip lifting a patient by herself; nor did it meet its burden of proving a normal activity of day-to-day living caused Fulmer's hip fracture. We therefore remand to the district court with directions that it remand to the OAH for entry of an order awarding benefits to Fulmer for both her August 12, 2008, and August 30, 2008, hip injuries.